In the District Court of the United States
For the Western Federal District of Oklahoma

**FILED**

NOV 3 0 2010

ROBERT D. DENNIS, CLERK
U.S. DIST. COURT, WESTERN DIST. OF OKLA.
BY_____ DEPUTY

Richard L. Cornforth,       )
                            )
Plaintiff,                  )
                            )
Vs.                         )          No. CIV-10-1003-R
                            )
Edward A. Goldman, d.b.a. GOLDMAN )
LAW, PLLC,                  )
                            )
Defendant.                  )

   Plaintiff, Richard L. Cornforth's, notice of law, also known as the ***standard of review*** in re *theft of honest services, the matter of Brooks Blitch, et al.* – **VERY SPECIAL NOTICE: Blitch articulated charges of racketeering by Judges while the Judges were acting in their capacity as Judges**

Richard L. Cornforth
1820 N. Glade Avenue
Bethany, Oklahoma 73008
Phone: (386) 747-7000
FAX: (260) 620-6235

November 26th 2010

<u>Notice of law</u>

I.  Richard Cornforth has repeatedly noticed this Court as well as the Chief Judge for the Western Federal District of Oklahoma in re The Honorable Stephen P. Friot's complicity in a 18 U.S.C. § 1346 conspiracy with defendant Edward A. Goldman and *state actors* including Lisa K. Hammond and John Whetsel to defraud and extort Richard L. Cornforth including Goldman's repeatedly cheating the taxpayers of Oklahoma County as well as Oklahoma taxpayers whose funding provides for the Oklahoma Supreme Court, also known as *theft of honest services* as provided for at 18 U.S.C. § 1346.  Due to the record which verifies that Judge Friot has repeatedly failed or refused to deny being Goldman's co-conspirator and/or failure to impeach the evidence already part of the file in this case, a federal grand jury should return an indictment against Stephen P. Friot finding probable cause to charge Stephen P. Friot with defrauding the federal taxpayers whose funding provides for the Western Federal District of Oklahoma via Stephen P. Friot's *theft of honest services* established through the doctrine of *silence is acquiescence,* to wit:

1. In *Carmine v. Bower,* 64 A.932, [the Court ruled and determined] "Silence is a species of conduct, and constitutes an implied representation of the existence of facts in question, and the estoppel by misrepresentation. When silence is of such a character and under such circumstances that it would become a fraud on the other party to permit the silent party to deny what his silence has induced the other party to believe and act upon, it will operate as an estoppel."

2. See also, *Wilson v. Meeks,* 52 F.3D 1547 (10th Cir. 04/20/1995) illustrating the meaning of Stephen P. Friot's misprision, to wit: To establish *fraud*

**by silence,** the plaintiff must show by clear and convincing evidence the following elements: **(1) that defendant [Friot] had knowledge of material facts which plaintiff [Cornforth] did not have and which plaintiff could not have discovered by the exercise of reasonable diligence.** Lisa K. Hammond, one of Goldman's co-conspirators in scheme of fraud and extortion which is undeniable on court records, first claimed, on February 23rd of 2009, that Federal Judge Friot required that she meet with him in his office, presumably in the federal courthouse in Oklahoma City, at 9:00 on March 20th, the day that, by agreement of the parties, a trial was to commence pitting the adjudicative skills of 43-year-bar-licensed attorney Edward A. Goldman against non-bar, pro se litigant and law-educator Richard "Luke" Cornforth. The parties, on February 23rd of 2009, in deference to Friot's alleged requirement for Hammond's attendance in Friot's office, mutually agreed to commence a two-day trial on March 23rd at 9:00 am in the Oklahoma County Courthouse. At 9:00 on March 23rd of 2009, Richard Cornforth was present and ready to contest Goldman's claims and advance his own counterclaims. Goldman and his witnesses were observed leaving the area of Hammond's courtroom about ten minutes before the hour. Richard Cornforth was in the courtroom and prepared for trial when Hammond's court reporter, Amy Rhea, began setting up the courtroom for a trial.[1] At about ten minutes after the hour, Hammond's clerk or bailiff, after scanning the courtroom and reporting to

---

[1] There is absolutely no explanation as to why Goldman and his witnesses left about ten minutes before the hour when it was not until about ten minutes after the hour, twenty minutes later, that Hammond supposedly phoned from Boston to relay that she would not be in attendance **OTHER THAN ONE OF MANY EX PARTE STRATEGY SESSIONS HAMMOND/GOLDMAN AND JUDGE FRIOT'S RELIABILITY IN THE CONSPIRACY TO VIOLATE 18 U.S.C. § 1346.**

Hammond, claimed that Hammond had been bumped from her flight returning from "Boston" and would not be able to commence the trial timely. Hammond's clerk or bailiff left a phone message at approximately 1:20 pm on March 23rd that Hammond had arrived back in Oklahoma City and was ready to commence the trial at 3:00. **NOTE: I, Richard Cornforth, had arraigned for a retired FBI agent and a private investigator to be present at the 9:00 am, March 23rd trial; after Hammond's evasion, they left the courthouse and were not available for a trial to commence at a time unknown to them.[2] After I checked the flight itineraries and found that no flight could have left Boston and arrived in Oklahoma City within the times alleged, I declined to appear, surmising the "trial" to be a setup as it would not be observed by my investigators who could have, among other things, verified Hammond's alteration of the trial transcript, an of-record practice of Hammond. Reasonably and logically, Hammond and Goldman conspired to conduct a "trial" without critical observation which would have incriminated Hammond and Goldman.** Amy Rhea's transcript of the meeting of February 23rd was not transcribed until March 25th enabling Rhea to alter the record to Hammond's satisfaction including changing the spoken word of Hammond from "Federal Judge Friot has asked me to meet with him in his office at nine o'clock on the morning of March the 20th and I don't know how long that meeting will take," to "Earlier this afternoon I received a call from Judge Friot, from the Western Federal District of Oklahoma, who advised that I may be

---

[2] This further suggests that Friot was part of the conspiracy even then – regardless, this Court has already been noticed of the law providing that *late entrants* in a conspiracy are deemed to know all the elements of the conspiracy from day one.

requested to go to a conference on the 20th." Using this subterfuge, Hammond and Goldman evaded a trial on the merits and met ex parte and agreed to have a trial in April 1st when Hammond and Goldman both knew via the February 23rd conference that Richard Cornforth would be traveling and out of state; however, **Hammond never signed an order setting April 1[st] as the trial date**. On April 1[st], Hammond and Goldman conducted an ex parte, default trial, and within 55 seconds, allegedly swore in witnesses, plural, excluding of course, Goldman's witness Russell Adams who Goldman excused five and a half hours before the so-called trial based on Goldman's revelation that he'd already won.  The alleged witnesses' testimony was sufficient to deprive Richard Cornforth of about two hundred thousand dollars of money and property. Richard Cornforth has repeatedly exercised due diligence by questioning Hammond *and Friot* for records which verify that Friot requested Hammond to attend a conference on March 20th of 2009, which according to Hammond was in Boston, the purpose of the conference, who paid for Hammond's travel and accommodations to and while in Boston, and whether Hammond had an approved leave of absence excusing her from her duties in Oklahoma County? **NOTE: For Hammond's fantastic story to be true, Hammond would have had to have traveled by unknown conveyance to Boston and been in Boston at 9:00 am EST on the 20th of March, then Hammond would have to have left Boston almost immediately and traveled by privately chartered supersonic jet to meet,**

ex parte,[3] with Goldman in the Oklahoma County Courthouse late in the afternoon of March 20th, then traveled back to Boston via unknown means, then learned only at about 9:00 am CST on March 23rd that she had been bumped attempting to fly standby *to be in Oklahoma City at 9:00 am CST on March 23rd* and resorted again to a privately chartered, supersonic jet to be able to return to Oklahoma City by the early afternoon of March 23rd !

Obviously, Friot had material facts regarding the *alleged* Friot/Hammond meeting which Richard Cornforth, acting in due diligence, was not able to obtain due to Friot's silence. **(2) that defendant was under an obligation to communicate the material facts to the plaintiff**. Friot had a non-discretionary duty found at Judicial Canon Three, Section B, (3), to investigate the fantastic story Hammond used in her conspiracy with Goldman which fully facilitated Goldman's scheme of fraud and extortion. **(3) that defendant intentionally failed to communicate to plaintiff the material facts**. Friot has, multiple times, failed or refused to answer regarding Hammond's absolutely ridiculous story; had Friot answered, the Hammond/Goldman scam would have ended about May of 2009 instead of Richard

---

[3] Goldman and Hammond are both so arrogant as to make a record of some of their ex parte meetings! The arrogance of Goldman and Hammond is understandable in contemplation that Goldman and Hammond believed that no matter what they did, Friot would cover for them in federal court proceedings ( Judge Friot has in fact recused in this instant case ) and unknown parties behind the scenes in the Oklahoma Supreme Court would fix any appeal of their mischief, a theory that is already verified on the record made in petition number 107104 where records prove that either: (a) The Oklahoma Supreme Court has repeatedly aided and abetted the Goldman/Hammond fraud amounting to the Oklahoma Supreme Court violating not only 18 U.S.C. § 1346 but Article 2, Section 6 of the Oklahoma Constitution and 18 U.S.C. § 241 as well, or (b), the inner workings of the Oklahoma Supreme Court are so slipshod that Supreme Court clerks, referees, and law clerks routinely violate 18 U.S.C. § 1346, Article 2, Section 6 of the Oklahoma Constitution and 18 U.S.C. § 241; and, due to clerks, referees, and law clerks impersonating the Oklahoma Supreme Court, many felony violations of 21, O.S. § 1533 have occurred as well.

Cornforth being subjected to ongoing fraud, extortion, and harassment including multiple use of SWAT teams to make thinly-veiled death threats to Richard Cornforth for failure to pay Goldman's commissions and fees which are verified, of-record, as being a scam. **(4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff**. Richard Cornforth had a reasonable expectation of fair and honest public administration including holding Friot to his oath and duty found at 28 U.S.C. § 453, also known as a *statutory duty,* and **(5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to the plaintiff.** Due to the cover-up, now verified as orchestrated by Friot, Richard Cornforth has been defrauded out of about two hundred thousand dollars, meaningful access to court, freedom of speech and assembly, and freedom to travel without being stalked, assaulted, and possibly assassinated for exposing Goldman's scams which likely represent only the tip of the tip of the proverbial iceberg!

## NOTICE TO ALL THE JUDGES OF THE WESTERN FEDERAL DISTRICT OF OKLAHOMA OF THE IMPORTANCE OF THIS CASE:

The Goldman/Hammond/Whetsel/*Friot* scam, aided and abetted by an untold number of other *state actors,* a blatant violation of 18 U.S.C. § 1346, due to the longstanding, countrywide, and pervasive nature of the scam, renders *Blitch* insignificant in comparison and bears on the Western Federal District the duty refrain from obstructing justice in re this *Private Attorney General's* efforts to eradicate this racket which shall result in a tremendous economy to the United States Department of Justice.

FROM: *U.S.A. v. Blitch* **a state court judge** et al., case number 09-10300-J CCA-11 for the Middle Federal District of Georgia.

Brief synopsis of the case:

Two former state-court **judges**--one of them, formerly, a chief judge--as well as an **attorney** and a court administrator were indicted in Georgia, in a federal case over state judicial corruption.

Charged were Brooks Blitch III, formerly chief judge of the Alapaha Circuit, who resigned after 28 years on the bench; Berrien Sutton, a part-time juvenile court judge and former state court judge in Clinch County who also resigned from the bench; his wife, Lisa Sutton, court administrator of the Alapaha Circuit; attorney George Bessonette; and a fifth individual, Hayward Collier. Blitch was arraigned in Macon, the Middle District of Georgia.

Although a lawyer for Blitch claimed that he didn't know what the charges were against Blitch, at Blitch's arraignment, the <u>Fort Mill Times</u>  indicated that Blitch faced <u>fraud</u>, <u>**conspiracy**</u> and <u>**extortion**</u> charges  as part of  widespread corruption.

**NOTE REGARDING A RELIABLE STANDARD OF REVIEW: A copy of the Blitch indictment is attached. See also, plea agreement of guilty including guilty of <u>18 U.S.C. § 1346</u> attached. Finally, see the judgment order of the court in *Blitch*. Also, those private individuals who were defrauded by Blitch's conspiracy should be informed by the DOJ that they can file for treble damages against Blitch et al. beyond reach of a statute of limitations as** "Defendant's plea of guilty waives right to assert any statute of limitations [in Civil RICO complaints]," <u>Secrets of the Legal Industry</u>, at page 165.

II.  Also, this Court ordering any appearances such as a pretrial status conference, so long as the bogus arrest warrant is still active, would constitute this Court's violation of 18 U.S.C. § 241 as Goldman would be empowered to call in a goon squad from

7

Goldman's co-conspirator Sheriff Whetsel who would arrest Richard Cornforth to prevent Richard Cornforth from appearing at a federally mandated hearing, haul Richard Cornforth to the Oklahoma County jail and attempt to beat Richard Cornforth severely enough to compel Richard Cornforth to borrow enough money to pay Goldman's commissions and fees; and if Richard Cornforth, after being beaten still refused, Richard Cornforth would be likely be assassinated and the killing be excused as, Oops! Another incident of inmate-on-inmate violence!   **That'd scare the wits out of anyone who thinks they don't have to pay an attorney's fees amounting to *domestic terrorism* !**

Prepared and submitted by:

Richard L. Cornforth

## Certificate of service

I, Richard L. Cornforth, certify that November 26th, 2010, I mailed a true and correct copy of the above and foregoing notice to: Edward A. Goldman, 222 N. W. 13th Street, Oklahoma City, Oklahoma 73103.

Richard L Cornforth

Copies to:

United States Department of Justice
Organized Crime and Racketeering Section
Attn: Broken Gavel/Broken Wheel
950 Pennsylvania Avenue, NW
Washington, DC 20530

D.O.J. Criminal Division
Chief of Fraud Section, Denis J. McInerey
Attn: Duty Attorney
950 Pennsylvania Avenue, NW
Washington, DC 20530

Leah E. McEwen
P.O. Box 366
Albany, GA 31701

Maxwell Wood
P.O. Box 1702
Macon, GA 31202-1702

Graham A Thorpe
300 Mulberry Street, Suite 400
Macon, GA 31201

- and -

James N. Crane
P.O. Box 366
Albany, GA 31702

# EXHIBIT A

S

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF GEORGIA
## MACON AND VALDOSTA DIVISIONS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : **CASE NO.** 5:08-CR-40-H2 |
| **v.** | : |
| | : **VIOLATIONS:** |
| | : 18 U.S.C. §§ 2, 922(g)(1) |
| | : 1001(a)(2), 1341, 1343, 1346, |
| | : 1349, 1503,1513, 1623, 1951 |
| **BROOKS E. BLITCH, III ,** | : |
| **BERRIEN L. SUTTON,** | : |
| **LISA SUTTON,** | : |
| **HAYWARD COLLIER,** | : |
| **GEORGE BESSONETTE,** | : |
| | : |
| | : |
| **Defendants.** | : |
| | : |

## THE GRAND JURY CHARGES:

That at all times relevant to this Indictment:

**Introduction:**

### A.  Judge Blitch and the Alapaha Judicial Circuit:

1.    The Alapaha Judicial Circuit ("Alapaha Circuit") is a unit of local

government and a political subdivision of the State of Georgia.  The Alapaha

Circuit consists of the following counties:  Clinch, Lanier, Berrien, Cook and

Atkinson. All of these counties except Atkinson are within the Valdosta Division

1

of the Middle District of Georgia.

2.     Defendant Brooks E. Blitch, III, ("Judge Blitch") was a

Superior Court Judge of the Alapaha Circuit and took office in 1980 and

subsequently became Chief Superior Court Judge.

### B.     George Bessonette, Berrien and Lisa Sutton:

3.     Defendant Berrien Sutton ("Sutton") is an attorney in private practice in

Homerville, Georgia, was the elected State Court Judge for Clinch County, and

was appointed by Judge Blitch to the position of Juvenile Court Judge for the

Alapaha Circuit on November 2, 2000.  Beginning in approximately 1997 and

continuing until approximately 2006, Berrien Sutton represented family members

of Judge Blitch and their corporate interests in civil and criminal litigation.  Thus,

the Blitch family owed substantial attorney's fees to Sutton.

4.     Lisa Sutton, the wife of Berrien Sutton, was appointed by Judge

Blitch to be Court Administrator and Alternative Dispute Resolution ("ADR")

coordinator for the Alapaha Circuit.  In addition, Lisa Sutton operates an entity

called "In the Best Interests of the Children" ("IBIC").  Judge Blitch would not

grant a decree of divorce in cases involving the custody of minor children unless

the divorcing spouses attended the IBIC seminar and paid Lisa Sutton $30 per

spouse.

2

5. George Bessonette is an attorney in Homerville, Georgia. Bessonette originally worked for Berrien Sutton as an associate. Thereafter, Judge Blitch made Bessonette his law clerk. In exchange therefore, Bessonette received salary in the amount of approximately $30,000 per year. Judge Blitch instructed Bessonette that his primary job responsibility while being paid as law clerk would be to act as Juvenile Judge for the Alapaha Judicial Circuit. In approximately 2001, the Georgia General Assembly funded juvenile court judgeships throughout the state. At that time, Judge Blitch appointed both Bessonette and Berrien Sutton as part-time juvenile judges for the Alapaha Circuit. Bessonette held most of the court proceedings until 2005 when he took a position as Assistant Public Defender in the Alapaha Circuit.

### C. The Duties and Responsibilities of a Superior Court Judge:

6. A superior court judge in the State of Georgia takes an oath to uphold the laws of the State of Georgia and the constitution of the United States, O.C.G.A. § 15-6-6.

The duties and responsibilities of a Chief Superior Court Judge include:

a. Supervising grand juries, presiding over criminal trials, pleas of guilty, sentencing, bond and probation revocation and related matters;

b. Presiding over civil lawsuits and related matters;

c. Appointing judges and magistrates to juvenile and magistrate courts; and,

3

d.    Collecting and remitting to the various county commissions monies collected

through fines, restitution, fees and surcharges in criminal and civil cases. O.C.G.A.

§ 15-6-8.

    **D.    The Responsibilities of a State Court Judge:**

7.    A State Court Judge likewise takes an oath to uphold the laws of the State

of Georgia and the Constitution of the United States. O.C.G.A. § 15-7-20

8.    The duties and responsibilities of a State Court Judge include:

a)    Presiding over misdemeanor criminal proceedings, trials, pleas of guilty,

      sentencing, bond, probation revocation and related matters;

b)    Presiding over civil lawsuits and related matters;

c)    Collecting and remitting to the county commissions monies collected from

      fines, restitution, fees and surcharges in criminal and civil cases. O.C.G.A. §

      15-7-4.

    **E.    The Duties of a Juvenile Court Judge:**

9.    The duties and responsibilities of a juvenile court judge include presiding over

matters involving juvenile delinquency, deprivation,  paternity and legitimation.

O.C.G.A. § 15-11-28.

    **F.    The Georgia Code of Judicial Conduct:**

10.    The Georgia Code of Judicial Conduct is binding on judges of the superior,

state, magistrate and juvenile courts, including Judges Blitch, Sutton and Bessonette.

Canons 1, 2A, 2B, 3B(7), 3B(11), 3C(4), 3E(1)(c), 3E(2), and 5C(4) are incorporated

herein by reference.

### G.    Juvenile Court Judge Salaries:

11.  Georgia law governs how juvenile court judges shall be paid. In particular,

O.C.G.A. § 15-11-18 sets out a *pro-rata* payment schedule for part-time juvenile

court judges.

### H.  Judicial Retirement

12.  The State Employees Retirement System of Georgia calculates retirement

benefits based on a percentage of an employee's highest two years of service.

Berrien Sutton was paid approximately $17,000 per year to act as State Court

Judge.  From 2001-2007, Berrien Sutton was paid approximately $42,500 per year

to act as juvenile court judge; thus, increasing the base amount considered for

retirement purposes from approximately $17,000 to approximately $59,500.

### I.    Alternative Dispute Resolution Program:

13.  The Georgia General Assembly created an Alternative Dispute Resolution

Program funded by additional fees associated with the filing of civil actions in the

Superior, State, Probate and Magistrate Courts throughout the state. O.C.G.A. § 15-

23-1 et seq.  By doing  so, the Georgia General Assembly sought to increase judicial

economy by allowing for and funding mediation, arbitration, early case evaluation

or early neutral evaluation, summary jury trial and mini-trial. The Chief Superior

Court Judge of the Circuit was empowered to direct the activities and expenditures

of the board governing the ADR program in an effort to promote the alternative

resolution of disputes and the efficient administration of justice.

14.    By virtue of their respective positions described above, Judge Blitch,

George Bessonette and Berrien and Lisa Sutton inherently owed a duty to uphold

and enforce the laws of the State of Georgia and of the United States.

15.    In discharging their public duties, Judge Blitch, Berrien and Lisa Sutton and

George Bessonette were bound by certain laws, ordinances, ethical requirements

and duties, including providing honest services to the citizens of the State of

Georgia and to act in their best interests.

## COUNT ONE

**Honest Services Fraud Conspiracy – Brooks E. Blitch, III, Berrien Sutton,
Lisa Sutton and George Bessonette
18 U.S.C. §§ 1341, 1343 and 1346 i/c/w 1349**

1. Paragraphs 1-15 of the Introduction are incorporated herein by reference
   **A.    The Object of the Conspiracy:**

1.    It was the object of the conspiracy to obtain and attempt to obtain monies of

the taxpayers of the State of Georgia by fraud and false pretenses and to divert and

6

attempt to divert these monies for the personal benefit of the conspirators and to

deprive and attempt to deprive the citizens of the State of Georgia of the honest

services of the co-conspirators.

**B.     The Manner and Means of the Conspiracy and the Scheme to
         Defraud:**

1.      It was part of the manner and means of the conspiracy and the scheme to

defraud that Judge Blitch would and did:

a.      Create an unneeded  juvenile court judgeship as a financial favor for Berrien

        Sutton.  In exchange therefore, Judge Blitch received personal loyalty, free

        legal services and other intangible benefits.

b.      Create an unneeded position as court administrator as a financial favor to Lisa

        Sutton.  In exchange therefore, Judge Blitch received personal loyalty, free

        legal services and other intangible benefits.

c.      Divert funds collected for the ADR Program to Lisa Sutton as a financial favor.

d.      Create and promote a court-ordered counseling program (IBIC) for divorcing

        parents as a financial favor to Lisa  Sutton.  In exchange therefore, Judge

        Blitch received personal loyalty, free legal services and other intangible

        benefits.

e.      Allow Lisa Sutton to operate  said court-ordered counseling program (IBIC)

7

in an office provided at no charge by Clinch County.  In exchange therefore, Judge Blitch received personal loyalty, free legal services and other intangible benefits.

f.      Allow Lisa Sutton to divert monies collected by IBIC for her own benefit and the benefit of Berrien Sutton.  In exchange therefore, Judge Blitch received personal loyalty, free legal services and other intangible benefits.

g.      Authorize compensation of appointees Berrien Sutton, Lisa Sutton and George Bessonette in the court system beyond the fair value of services rendered and to reward said appointees for personal loyalty to Judge Blitch.  In exchange therefore, Judge Blitch received personal loyalty, free legal services and other intangible benefits.

h.      Create certain appointed positions for George Bessonette for which he was compensated with state monies.  In exchange therefore, Judge Blitch received personal loyalty, free legal services and other intangible benefits.

2.      It was further part of the manner and means of the conspiracy and scheme to defraud that Berrien and Lisa Sutton and George Bessonette would and did accept compensation far beyond the value of the limited services they rendered.  In exchange therefore, Judge Blitch received personal loyalty, free legal services and other intangible benefits.

C.    **Overt Acts**:

1.    In furtherance of the conspiracy, the Defendants committed the following

overt acts:

**a.  The Unnecessary Juvenile Judgeship**

i.    On November 7, 2000, Judge Blitch appointed Berrien Sutton as part-time

juvenile court judge.   Berrien Sutton accepted an appointment as part-time

Juvenile Judge for the Alapaha Circuit as a financial favor.   In exchange therefore,

Judge Blitch received personal loyalty, free legal services and other intangible

benefits.

ii. Berrien Sutton did little or no work as a juvenile judge or on behalf of the juvenile

court.   Judge Blitch also caused Berrien Sutton  to be compensated far in excess of

the limited services he performed as juvenile court judge.

iii. Judge Blitch caused Berrien Sutton to receive approximately $42,500 per year in

salary and accrue additional retirement benefits to which he was not entitled for

serving as the Juvenile Court Judge.   During the period 2001-2007, these monies

were sent from State of Georgia funds to the Clerk of Court of Clinch County via the

United States Mails on a quarterly basis.

iv. Berrien Sutton knew at the time that he accepted the appointment that the position

was unnecessary and that it was provided to him as a financial favor in order to help

9

him get out of debt.  In exchange therefore, Berrien Sutton gave and Judge Blitch received personal loyalty, free legal services and other intangible benefits.

v.  In approximately November of 2007, Berrien Sutton stated in filings with the Judicial Qualifications Commission, "There is no need for a full time judge as all juvenile work in this small circuit could be handled in one full day per week or on two half days."

vi.  Berrien Sutton intended  to significantly increase the amount of retirement benefits to which he would become eligible by receipt of the monies as juvenile judge. Berrien Sutton filed and caused others to file on his behalf statements detailing his salary as juvenile judge.  These filings were sent via United States Mails and interstate wires.  Berrien Sutton corresponded with representatives of the State Employees Retirement System regarding this false information via United States Mails and interstate wires.

vii.  Berrien Sutton sent and caused to be sent false and fraudulent statements designed to increase his retirement benefits and did mail the same to the State Employees Retirement Board in Atlanta, Georgia.

viii. Berrien Sutton made "kickback" or "under the table" payments to George Bessonette as compensation for his work as juvenile judge  rather than to adjust his official payment in order for Sutton  to keep his retirement potential as high as

10

possible.

ix. Berrien Sutton rarely attended juvenile court proceedings or any other business of the juvenile court.

x. During most of this six year period, Berrien Sutton did not attend mandatory continuing judicial training for juvenile court judges as required by the State of Georgia.

### b. George Bessonnette

i. In 1997, Judge Blitch hired Bessonette to be his law clerk. Bessonette received approximately $30,000 per year from the state of Georgia as his law clerk salary. However, Bessonette performed few duties as law clerk. This practice continued from 1997-2001. Bessonette worked in other private capacities during this time.

ii. The vast majority of Bessonette's time during this period was spent sitting as acting juvenile court judge for the Alapaha Circuit. Because of this practice, Judge Blitch's work load was decreased in that he did not have to preside in juvenile court.

iii. In 2001 Judge Blitch created the position of Court Administrator and diverted the monies previously spent on the law clerk to Lisa Sutton.

iv. After 2001, Judge Blitch regularly appointed George Bessonette as superior court judge "pro tem," that is on a temporary basis. Because of this practice, Judge

11

Blitch's work load was decreased.

v.  George Bessonette  received approximately $600 per day for acting as superior

court judge.

vi.  Judge Blitch appointed George Bessonette as pro tem  for Judge Blitch's  own

benefit and that of Bessonette.  In exchange therefore, Judge Blitch received

personal loyalty and other intangible benefits.

vii.  In 2004, Judge Blitch  learned that he would no longer be unilaterally able to

appoint George Bessonette and others as superior judge pro tem but rather would

be required to route his requests through the District Court Administrator.  At this

time, Bessonette took a position as an Assistant Public Defender in the Alapaha

Judicial Circuit.

### c.  The Unnecessary Court Administrator

i.  On or about January 1, 2002, Judge Blitch appointed Lisa Sutton as Court

Administrator. Lisa Sutton accepted a position as the Court Administrator for the

Alapaha Circuit.  She collected approximately $2000.00 per month in salary from

the State of Georgia.  This job was intended to be a full-time job.  During the

period November 14, 2002, through October 14, 2007, Lisa Sutton received

$124,660.00 for her position as Alapaha Circuit Court Administrator.  In exchange

therefore, Judge Blitch received personal loyalty, free legal services and other

intangible benefits.

### d. In The Best Interest of the Children

i. On or about July 1, 1997, Judge Blitch ordered all divorcing spouses with

children in all of the counties of the Alapaha Circuit to attend "In the Best Interest

of the Children" (IBIC), a program created by Lisa Sutton. This program provides

counseling for divorcing spouses with children in the Alapaha Circuit and other

surrounding areas.  Lisa Sutton charged each spouse a fee of approximately $30.00

per person.  These  monies were typically sent via United States Mails to Lisa

Sutton. Lisa Sutton profited from the scheme as follows:  during the period

November 14, 2002 through October 14, 2007 Lisa Sutton received $98,603.00

from IBIC. In exchange therefore, Judge Blitch received personal loyalty, free legal

services and other intangible benefits.

ii. In or about the late 1990s, Judge Blitch caused Clinch County to provide

county office space for Lisa Sutton to run IBIC. Judge Blitch also required the

other four counties of the circuit to contribute to Lisa Sutton's utility and office

expenses. Lisa Sutton accepted a free, county-owned office space and utilities  to

run her private entity, IBIC.

iii. On or about July 7, 1997, Judge Blitch issued an order requiring the Clerk of

Court of Clinch County to pay for a professional video presentation out of county

funds which would be shown at the IBIC seminar.

### e.  Alternative Dispute Resolution

i.     On or about November 17, 1997, Judge Blitch signed an order appointing

Lisa Sutton as the coordinator of the Alternative Dispute Resolution (ADR)

program.  In exchange therefore, Judge Blitch received personal loyalty, free legal

services and other intangible benefits.

ii.   Judge Blitch caused Lisa Sutton to be paid approximately $2,000 per month

plus travel expenses from the ADR monies and to divert the same to her personal

benefit, rather than to be expended on legitimate ADR programs.  In exchange

therefore, Judge Blitch received personal loyalty, free legal services and other

intangible benefits.

iii.  Judge Blitch caused Lisa Sutton to be compensated far in excess of the value of

the limited services she rendered as court administrator and ADR coordinator.

### f.  The Handwritten Conspiracy Note

i.     At some point in 2001, the exact date being unknown, Judge Blitch, Berrien

Sutton, Lisa Sutton and George Bessonette prepared and caused to be prepared a

written breakdown of how they planned to divert state and local monies for their

own benefit.

ii.  Under the handwritten proposal, the Suttons would receive $69,000 ($36,000 to

14

Berrien Sutton, $33,000 to Lisa Sutton) and George Bessonette would receive $74,800 consisting of juvenile, city court and superior court pro tem salaries. In exchange therefore, Judge Blitch received personal loyalty, free legal services and other intangible benefits.

iii. Judge Blitch without authority diverted monies from the Law Library Funds to pay an assistant for Lisa Sutton.

### D.   Use of the Mails/Wire:

1.   **Mails**

a) Throughout the pendency of the conspiracy, the defendants did use the United States Mails to: 1) receive monies in the form of salary, travel and per diem payments from the State of Georgia; 2) receive monies from divorcing spouses to pay for attending the IBIC program referenced above; 3) receive monies in the form of civil filing fees of which ADR funds were a part; 4) receive periodic bank statements detailing the receipt of the fraudulently obtained funds; 5) send letters notifying litigants of the requirement to attend and participate in the mandatory ADR and IBIC programs; 6) receive monies from the State of Georgia intended to be compensation for work done as part-time juvenile judge and, 7) receive periodic statements from the State Employees Retirement System detailing benefits to which the co-conspirators had become entitled based upon false information submitted on

the behalf of Berrien Sutton.

2.    **Wires**

b) Throughout the pendency of the conspiracy Judge Blitch and Lisa Sutton received monies in the form of salary by direct deposit bank transfer from the State of Georgia and other entities.

E.    **The Conspiracy:**

Beginning on or about January 1, 1997, and continuing until on or about December 4, 2006, in the Valdosta Division of the Middle District of Georgia, and elsewhere within the jurisdiction of the Court, the defendants,

**BROOKS E. BLITCH, III, BERRIEN SUTTON, LISA SUTTON AND**

**GEORGE BESSONETTE,**

conspired, combined, confederated, agreed and had a tacit understanding with one another and with others both known and unknown to the grand jury, to devise a scheme and artifice to defraud the citizens of the State of Georgia of their honest services and to obtain money by means of false and fraudulent pretenses and representations and the omission of material facts, and for the purpose of executing such scheme or artifice, and attempting  to do so, placed in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, and by any private or commercial interstate carrier,

16

and caused to be deposited or delivered, any such thing according to the direction

thereon, and took and received therefrom any such matter or thing and by transmitting

and causing to be transmitted in interstate commerce any writing, sign, signal, picture

and sound for the purpose of executing such scheme and artifice.

All in violation of Title 18, United States Code §§ 1349 i/c/w 1341, 1343

and 1346.


## COUNT TWO
### Mail Fraud – Lisa Sutton, Berrien Sutton
### and Brooks Blitch, III
### 18 U.S.C. §§ 1341, 1346 and 2

1. Paragraphs 1-15 of the Introduction are incorporated herein by

reference.

Beginning on or about January 1, 1997, and continuing through on or about

December 4, 2006, and more specifically on or about May 24, 2004, in the Valdosta

Division of the Middle District of Georgia, and elsewhere within the jurisdiction of

this Court,  the defendant,

### BERRIEN SUTTON,

aided and abetted by **LISA SUTTON and BROOKS  E. BLITCH, III**, did devise

a scheme  and artifice to defraud and to obtain money by means of false and fraudulent

pretenses and representations and the omission of material facts, and for the purpose

17

of executing such scheme or artifice, or attempting to do so, placed in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, and by any private or commercial interstate carrier, and caused to be deposited or delivered, any such thing according to the direction thereon, and took and received therefrom any such matter or thing for the purpose of executing such scheme and artifice.

As a part of the scheme and artifice to defraud, the co-defendants engaged in the following activities:

1. Berrien Sutton accepted an appointment as part-time Juvenile Judge for the Alapaha Circuit as a financial favor.

2. Berrien Sutton did little or no work as a juvenile judge or on behalf of the juvenile court.

3. Judge Blitch caused Berrien Sutton to receive approximately $42,500 per year in salary for serving as the Juvenile Court Judge. During the period 2001-2007, these monies were sent from State of Georgia funds to the Clerk of Court of Clinch County via the United States Mails on a quarterly basis.

4. For a period of approximately five years, Berrien Sutton failed to complete the necessary training to be qualified to serve as a juvenile judge in the State of Georgia.

5. Berrien Sutton knew at the time that he accepted the appointment that the position

was unnecessary and that it was provided to him as a financial favor in order to help him get out of debt. In exchange therefore, Judge Blitch received personal loyalty, free legal services and other intangible benefits.

6. In approximately November of 2007, Berrien Sutton stated in filings with the Judicial Qualifications Commission, "There is no need for a full time judge as all juvenile work in this small circuit could be handled in one full day per week or on two half days."

7. Berrien Sutton intended to significantly increase the amount of retirement benefits to which he would become eligible by receipt of the monies as juvenile judge. Berrien Sutton filed and caused others to file on his behalf statements detailing his salary as juvenile judge. These filings were sent via United States Mails and interstate wires. Berrien Sutton corresponded with representatives of the State Employees Retirement System regarding this false information via United States Mails and interstate wires.

8. Berrien Sutton made "kickback" or "under the table" payments to George Bessonette as compensation for his work as juvenile judge rather than adjust his official payment in order for Sutton to keep his retirement potential as high as possible.

9. On or about May 24, 2004, Berrien Sutton sent and caused to be sent false and fraudulent statements designed to increase his retirement benefit and did deposit or

caused to be deposited the same in the United States Mail for delivery to the State

Employees Retirement Board in Atlanta, Georgia.

All in violation of Title 18, United States Code § 1341, 1346 and 2.

## COUNTS THREE-EIGHT
### Mail Fraud – Lisa Sutton, Berrien Sutton
### and Brooks Blitch, III
### 18 U.S.C. §§ 1341, 1346 and 2

1. Paragraphs 1-15 of the Introduction are incorporated herein by reference.

Beginning on or about January 1, 1997, and continuing through on or about

December 4, 2006, and more specifically on or about the dates set forth in the chart

below, in the Valdosta Division of the Middle District of Georgia, and elsewhere

within the jurisdiction of this Court, the defendant,

## LISA SUTTON,

aided and abetted by **BERRIEN SUTTON and BROOKS E. BLITCH, III**, did

devise a scheme  and artifice to defraud and to obtain money by means of false and

fraudulent pretenses and representations and the omission of material facts, and for the

purpose of executing such scheme or artifice, or attempting to do so, placed in any

post office or authorized depository for mail matter, any matter or thing whatever to

be sent or delivered by the Postal Service, and by any private or commercial interstate

carrier, and caused to be deposited or delivered, any such thing according to the

direction thereon, and took and received therefrom any such matter or thing for the purpose of executing such scheme and artifice.

As a part of the scheme and artifice to defraud, the co-defendants engaged in the following activities:

1.  Lisa Sutton created a program called "IBIC." This program provides counseling for divorcing spouses with children in the Alapaha Circuit and other surrounding areas. Judge Blitch compelled divorcing spouses by court order to attend this class. Lisa Sutton charged each spouse a fee of approximately $30.00 per person. These monies were typically sent via United States Mails to Lisa Sutton. Lisa Sutton accepted a free, county-owned office space from which to run her private entity IBIC. Lisa Sutton profited from the scheme as follows: during the period November 14, 2002 through October 14, 2007 Lisa Sutton received $98,603.00 from IBIC.

2.  Judge Blitch created the position of the coordinator of the Alapaha Circuit Alternative Dispute Resolution Program ("ADR"). On or about November 17, 1997, Judge Blitch signed an order appointing Lisa Sutton as the coordinator of the Alternative Dispute Resolution (ADR) program. Judge Blitch caused Lisa Sutton to be paid approximately $2,000 per month plus travel expenses from the ADR monies and to divert the same to her personal benefit, rather than to be expended on legitimate

ADR programs. These monies were often sent using the United States Mails to the various clerks of court throughout the Alapaha Circuit. Thereafter, the clerks of court or other officials would mail correspondence related to the collection of the fees as well as regular remittance of the fees to the Secretary-Treasurer of the ADR Program using the United States Mail. In exchange for these monies, Lisa Sutton did little or no work. Judge Blitch caused Lisa Sutton to be compensated far in excess of the value of the limited services she rendered as  ADR coordinator. During the period November 14, 2002, through October 1, 2007, Lisa Sutton received at least $113,900.00 from ADR.

3. On or about January 1, 2002, Judge Blitch appointed Lisa Sutton as Court Administrator. Lisa Sutton accepted a position as the Court Administrator for the Alapaha Circuit. She collected approximately $2000.00 per month in salary from the State of Georgia. This job was intended to be a full-time job. During the period November 14, 2002, through October 14, 2007, Lisa Sutton received $124,660.00 for her position as Alapaha Circuit Court Administrator.

4. Lisa Sutton accepted monies from Atkinson, Berrien, Cook and Lanier Counties which were used to pay for her utilities and office expenses.

5. Beginning January 1, 2002, and continuing to the time of this indictment, Lisa Sutton was paid for doing all three jobs. During the period November 14, 2002,

22

through October 14, 2007, Lisa Sutton received at least: $113,900.00 from ADR;

$98,603.00 from IBIC; and $124,660.00 for her position as Alapaha Circuit Court

Administrator, totalling approximately $337,163.00 in fraudulently obtained benefits.

Lisa Sutton devoted most of her time to her own business venture (IBIC).

6.  Judge Blitch  diverted monies without authority  from the Law Library Funds to

pay an assistant for Lisa Sutton.

7.  The ADR program received numerous payments through the United States Mail.

These monies were ultimately diverted to the benefit of Lisa Sutton, as a financial

favor.  The  approximate dates, entity mailed from, address at which received and

amounts are listed below.

| Count 3 February 1, 2005 | Atkinson County Magistrate Court | ADR Program P.O. Box 433 Homerville, Ga | $2,662.50 |
| Count 4 March 1, 2005 | Atkinson County Magistrate Court | ADR Program P.O. Box 433 Homerville, Ga | $255.00 |
| Count 5 April 1, 2005 | Atkinson County Magistrate Court | ADR Program P.O. Box 433 Homerville, Ga | $202.50 |

| Count 6<br><br>May 1, 2005 | Atkinson County<br><br>Magistrate Court | ADR Program<br><br>P.O. Box 433<br><br>Homerville, Ga | $180.00 |
|---|---|---|---|
| Count 7<br><br>June 1, 2005 | Atkinson County<br><br>Magistrate Court | ADR Program<br><br>P.O. Box 433<br><br>Homerville, Ga | $247.50 |
| Count 8<br><br>July 1, 2005 | Atkinson County<br><br>Magistrate Court | ADR Program<br><br>P.O. Box 433<br><br>Homerville, Ga | $367.50 |

All in violation of Title 18, United States Code § 1341, 1346 and 2.

### <u>COUNT NINE</u>
**Honest Services Fraud Conspiracy– Brooks E. Blitch, III and Hayward Collier
Title 18 U.S.C. §§ 1341, 1343, 1346, 1349 and 2**

1. Paragraphs 1, 2, 6, 10, 14 and 15 of the Introduction are incorporated herein by reference.

2. Georgia law requires determinate sentences in criminal cases. O.C.G.A.§ 17-10-1(f) states: "Within one year of the date upon which the sentence is imposed . . . the court imposing the sentence has the jurisdiction, power and authority to correct or reduce the sentence and to suspend or probate all or any part of the sentence. Prior to

24

entering any order correcting, reducing or modifying any sentence, the court shall afford notice and an opportunity for a hearing to the prosecuting attorney. Any order modifying a sentence which is entered without notice and an opportunity for hearing ... is void." Further, O.C.G.A.§ 17-10-1(a)(5)(A) requires in sexual or violent offense cases in which probation is imposed but later shortened that the court shall afford notice to the victim or victims and prosecuting attorney.

A.   **The Object of the Conspiracy:**

1.   It was the object of the conspiracy to obtain and attempt to obtain monies of the taxpayers of the State of Georgia by fraud and false pretenses and to divert and attempt to divert these monies for the personal benefit of the conspirators and to deprive and attempt to deprive the citizens of the State of Georgia of the honest services of the co-conspirators.

B.   **The Manner and Means of the Conspiracy and the Scheme to Defraud:**

1.   It was part of the manner and means of the conspiracy and the scheme to defraud that Judge Blitch would and did:

a.   Engage in unethical *ex parte* communications regarding pending cases with attorneys, litigants, friends and family members of litigants and other persons.

25

b.      Enter judicial orders and take other official action based on his authority as a

Superior Court Judge in violation of Georgia laws, his oath of office and the ethical

rules and regulations governing the courts of the State of Georgia, including but

not limited to:  i) reducing sentences he had previously imposed as well as

sentences imposed by other judges without holding a hearing or providing notice as

required by law; ii) reducing bonds or otherwise authorizing the release of persons

incarcerated without holding a hearing; iii) engaging in plea negotiations or stating

in *ex parte* communications what ultimate outcome he intended to cause in a case.

c. Allow lay persons to collect money in exchange for their access to him and his

chambers.

2.      It was part of the manner and means of the conspiracy and the scheme to

defraud that Hayward Collier and CC#1 would and did:

a. Receive money and other consideration in exchange for introducing persons to

Judge Blitch.  These persons were seeking innappropriate judicial assistance in *ex*

*parte* meetings with Judge Blitch.

Beginning on or about June 26, 1989, and continuing through on or about

June 15, 2007, in the Valdosta Division of the Middle District of Georgia, and

elsewhere within the jurisdiction of this Court,  the defendants,

### BROOKS E. BLITCH, III, and HAYWARD COLLIER

26

conspired, combined, confederated, agreed and had a tacit understanding with one another and with others both known and unknown to the grand jury, to devise and attempt to devise a scheme and artifice to defraud the citizens of the State of Georgia of Judge Blitch's honest services and to obtain and attempt to obtain money by means of false and fraudulent pretenses and representations and the omission of material facts, and for the purpose of executing such scheme or artifice, or attempt so to do, placed in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, and by any private or commercial interstate carrier, and caused to be deposited or delivered, any such thing according to the direction thereon, and took and received therefrom any such matter or thing and by transmitting and causing to be transmitted and attempting to transmit and cause to be transmitted in interstate commerce any writing, sign, signal, picture and sound for the purpose of executing such scheme and artifice.

As a part of the scheme and artifice to defraud, the co-defendants engaged in the following overt acts:

1.    Unindicted Co-Conspirator #1 ("CC #1"), whose identity is known to the Grand Jury, is not an attorney and is a convicted felon. Judge Blitch has conducted more than 100 *ex parte* meetings regarding inappropriate judicial assistance with CC #1 alone or in the company of criminal defendants, or their friends and family

27

members.

2.      For many years, CC# 1 has accepted money from many of the individuals for whom he/she has interceded with Judge Blitch.

3.      CC# 1 has informed Judge Blitch that he/she was accepting money by saying things like, "You've got to do this for me; I'm broke and I need the money."

4.      CC# 1, in turn, supported Judge Blitch and various family members in their political campaigns.

5.      CC# 1 would actively campaign for Judge Blitch and others at his direction and was able to influence voters.

6.      CC# 1 knew from speaking to Judge Blitch that his/her support in getting him and his candidates votes was his/her payment for fixing cases.

7.      At a time and date unknown to the grand jury, CC# 1 contacted Judge Blitch on behalf of RM of Lakeland.  RM had a pending criminal case at the time of the contact.  CC #1 requested that Judge Blitch lessen RM's sentence.

8.      In August 2005, CC# 1 contacted Judge Blitch on behalf of KC who was incarcerated at the Lakeland Detention Center.  The purpose of the contact was to request that KC's sentence be lessened.

9.      At a time and date unknown, CC# 1 contacted Judge Blitch on behalf of MC. The purpose of this contact was to request that MCs' sentence be lessened.

10.    At a time and date unknown, CC# 1 contacted Judge Blitch on behalf of TJ. The purpose of this contact was to request that TJ's sentence be lessened.

11.    At a time and date unknown, CC# 1 contacted Judge Blitch on behalf of WR. The purpose of this contact was to request that WR's sentence be lessened.

12.    In the fall of 2004, CC# 1 contacted Judge Blitch on behalf of DM, Sr's son. CC# 1 and DM, Sr. met with Judge Blitch at his office. The purpose of this contact was to request that DM, Sr.'s son's sentence be lessened. This meeting took place during election time. Judge Blitch indicated that he would help DM, Sr.'s son and asked DM, Sr. to place campaign yard signs for JS3, then running for District Attorney.

13.    On or about July 3, 2003, CC# 1 contacted Judge Blitch on behalf of JM. The purpose of this contact was to request that JM's sentence be lessened.

14.    At a time and date unknown, CC# 1 contacted Judge Blitch on behalf of WST and WT. The purpose of this contact was to request that their sentences be lessened.

15.    At a time and date unknown, CC# 1 contacted Judge Blitch on behalf of EW. The purpose of this contact was to request that EW's sentence be lessened.

16.    At a time and date unknown, CC# 1 contacted Judge Blitch on behalf of CBW. The purpose of this contact was to request that CBW's sentence be lessened.

17.    At a time and date unknown, CC# 1 contacted Judge Blitch on behalf of JB.

The purpose of this contact was to request that JB's sentence be lessened.

18.     In February 2006, CC# 1 contacted Judge Blitch on behalf of FTC.  The purpose of this contact was to request that FTC's bond be lessened.  FTC was subsequently released on a reduced bond.  In June 2006, CC# 1 once again contacted Judge Blitch on behalf of FTC.  The purpose of this contact was to thank Judge Blitch for allowing FTC to be released on bond.

19.     At a time and date unknown, CC #1 contacted Judge Blitch on behalf of GW.  The purpose of this contact was to request that GW's sentence be lessened.

20.     Hayward Collier (a/k/a "Head") often attends court proceedings in Berrien County and meets with Judge Blitch in order to influence the outcome of criminal cases.

21.     On February 10, 2006, Hayward Collier contacted Judge Blitch on behalf of MAH.  Collier accepted $350 from MAH's representative in exchange for his assistance.  During the conversations leading up to the meeting with Judge Blitch, Collier instructed MAH's representative not to mention the exchange of money to Judge Blitch because Judge Blitch would believe that he was being set up by the FBI.  During this conversation Judge Blitch stated, "I'm going to cut off the fine that's $1,300 . . . I can't cut off the damages. . . I'll get in trouble."  MAH was originally placed on ten years probation in August 1997.  In January 2006, a petition for

probation revocation was filed alleging certain new crimes and technical

violations of probation. On February 10, 2006, Judge Blitch contacted Probation

Officer SW and instructed him to accept $2000 and give MAH time to pay the rest

of the fine. Further, Judge Blitch dismissed the warrant pending against MAH.

This was done without notice to the district attorney or a hearing.

22.    On or about January 19, 2006, Hayward Collier contacted Judge Blitch on

behalf of DJM. Collier asked Judge Blitch to release DJM who was then incarcerated

in the Berrien County Jail on drug related charges. DJM paid Collier approximately

$300 for his efforts. The district attorney was not made aware of this discussion.

23.    On or about October 15, 2005, AS and her brother contacted Judge Blitch on

behalf of their family member ES. The purpose of this contact was to request a

reduced sentence for ES. ES was sentenced to three years county jail on October 17,

2005, for the offense of aggravated assault  The district attorney was not aware of

Blitch's *ex parte* attempts to resolve the case before court.

24.    Beginning on or about April 13, 2007, GS telephoned Judge Blitch

repeatedly to request the early release from the detention center of her son, SS.

GS made these calls based on earlier conversations with Judge Blitch in which he

instructed her to contact him after one year had been served. On April 23, 2007,

when questioned by GS how the court would go about releasing her son early,

Judge Blitch stated, "I'll just issue an order. " On May 8, 2006, SS was sentenced

for the offense of aggravated battery to ten years probation with the first 700-730

days to be served in the probation detention center. On May 22, 2007, Judge

Blitch signed an order to modify the sentence which released SS on May 25,

2007. This was done without notice to the district attorney or a hearing.

25.     On or about April 16, 2007, Judge Blitch engaged in a series of *ex parte*

telephone calls with attorney JS concerning a client of JS's named PH. Judge Blitch

promised, "I'll take care of my part on the back side."

26.     On or about April 17, 2007, Judge Blitch telephoned the Berrien County

Superior Court Clerk's office and verified with S. that he had nolle prossed a ticket

on KG. During the conversation, Judge Blitch stated:  "Will you make absolutely

sure that I got rid of that ticket, nolle prossed it?"

27.     On or about April 17, 2007, BB telephoned Judge Blitch and requested that

he take care of a ticket for LA. Thereafter, Judge Blitch telephoned the sheriff's

office and instructed them to reduce the ticket to a warning. Judge Blitch stated,

"Ah, anyway it was 63, I think, in a 50. It's not real bad, I wanna reduce it down to

a warning. If you'll pull that and hold it for me, I sure would appreciate it." Judge

Blitch had no jurisdiction over this matter. The phone calls made by Judge Blitch

to illegally affect the outcome of this case transmitted and caused to be transmitted

in interstate commerce any writing, sign, signal, picture and sound for the purpose

of executing the scheme and artifice to defraud.

28.    On or about April 17, 2007, Judge Blitch telephoned the Probate  Judge of

Lanier County, and requested the dismissal of a speeding ticket on a JL. Judge Blitch

partially based this request on the fact that JL's cousin was AD, the  preacher.  This

ticket was later dismissed.

29.    On November 4, 2005, LAB was sentenced for vehicular homicide, DUI and

endangering a child.  The sentence was 11 years, 11 months of probation under the

First Offender Act. On April 12, 2007, LAB appeared in court because of a probation

violation.  Her first offender status was revoked and she was re-sentenced to eleven

years, the first seven to serve in prison followed by four years on probation. On or

about April 17, 2007,  Judge Blitch had an *ex parte* meeting in his office

with attorney RS  and discussed a reduction of the sentence of RS's client, LAB.

LAB had been convicted of vehicular homicide and was at the time of the meeting

serving a prison sentence for probation violation.  The following are excerpts of the

conversation between RS and Judge Blitch:

JB:    Well, R, let me tell ya, the way I felt about it...
RS:    You have to do it as you see it.
JB:    I didn't send her off because of the shoplifting.  I sent her off cause she didn't
       go to that golden rule and she hadn't done anything to get off drugs.
RS:    Yeah.

33

JB:   And she already killed one person. And to me it just...

RS:   I understand.

JB:   And I just felt like, you know, that it's not fair. That girl, person, man, whoever
       it was, died. And then she get an opportunity, and that's why I thought you did
       a marvelous job for her. I mean cause I looked at the sentence. And DP...

                    [. . .] [portion of conversation not included in indictment]

RS:   Let me ask you this, between you and me. Is there any way you could
       reduce that amount, or can't you? And I won't feel hard at you either damn
       way, I'll tell you that.

JB:   Let me tell you this. Let me think on it, but it won't be a whole lot, it might
       be a couple years I'll knock off of it, something like that.

RS:   Well, I think it was seven years, if I remember right.

JB:   And I'll tell you what, how that came about.

RS:   If you can't do it, listen, if you can't do it in good conscience...

JB:   I'm not going to tell you up or down. Let me look at it.

RS:   Okay.

JB:   Give me, give me several days, and let me talk to, okay.

RS:   Okay. Well that's, that's fair enough.

                                    [. . .]

JB:   Let me see how much damage it will do me to do it. I don't mind taking a
       hit, but I don't wanna get a bad hit now over that.

JB:   They will and I and you know I'm sorry bout that, but if, somebody had died
       because of her already, and that was important.

RS:   (Unintelligible) that's that's right, you're exactly right.

JB:   but let me think on it. I'm might be able to come down some on it.

RS:   Well if you can't ah, I've, I've asked this...

JB:   (Unintelligible) Let me tell you this... whatever I do I'll call you before I tell
       anybody else.

Later on June 13, 2007, Judge Blitch returned a telephone call where S was

checking to see what Judge Blitch had decided, Judge Blitch stated that he could

not reduce the sentence right now because he was scared.

30.   On or about April 23, 2007, BS telephoned Judge Blitch about getting a

driving permit for her son who had received a DUI in Lowndes County. Judge

Blitch stated, "I don't know if I can do it with it not being in my circuit."

31.   On or about April 23, 2007, BS2 called regarding her husband RS, then

incarcerated. Judge Blitch stated, "I can't do anything until tomorrow. I can try

and get him out in the morning, but he'll probably get out anyway, but I can't do

anything until I talk to his probation people." Later, on or about April 30, 2007,

Judge Blitch telephoned DL in the Clinch County Clerk's Office and requested

that he "red flag" the case of RS, stating "We've got to get him out of the DUI."

32.   On or about April 24, 2007, MC2, a convicted sex offender, telephoned Judge

Blitch seeking assistance with his child support case. Judge Blitch later telephoned

Atkinson County Child Support Services and left a message for RW not to lock up

MC2 for failure to pay child support.

33.   On or about April 24, 2007, CB telephoned Judge Blitch regarding MB,

(then incarcerated for aggravated assault) requesting that MB get a bond so that he

could be released on his child's birthday. Judge Blitch told CB, "I think it will

work out alright. If he'll just ...tell him if he will behave he, he can get out of this.

If he don't, I'm going to work on him sho nuff. Ok." Judge Blitch later released

MB after calling his probation officer, SW. This was done without notice to the

district attorney or a hearing.

34.     On or about April 24, 2007, Judge Blitch met at his office with MR and

NW, mother of KA, who was then incarcerated in the Clinch County Jail.  Judge

Blitch called probation and the sheriff's department and instructed them to tell KA

that he was not going to grant a bond and that he  had a choice  between nine

months in Bainbridge or two years in the detention center.  The district attorney

had no knowledge of Judge Blitch's *ex parte* attempts to resolve the case before

court.  This case was ultimately no-billed by the grand jury after NW testified that

the items allegedly stolen had been gifts given to KA by her.  KA served a

substantial period of time in jail without bond before the charges were dismissed.

35.     On or about April 24, 2007, PB met with CS in Judge Blitch's office about

pending child molestation charges against CS's  son   PS.   PB called George

Bessonette and JD to determine the status of the case.  An excerpt of the conversation

between PB and George Bessonette follows:

GB:   Right now I have been trying to get CT to get up a, been
        trying to get CT to get up a, uhm, some kind of a plea recommendation and I
        think that they are a little bit skittish over doing  kind of as good as we want
        them to do on a count of CH.  But, hopefully they will get up something and
        we will be able to work something out before too long.
PB:   But how does CH feel?
GB:   Well, I don't know specifically of anything that she has said about this case.
        But I just know how she generally does and . . .
PB:   Yeah.
GB:   And anytime she thinks that Brooks is trying to help anybody very much
        and they don't never, they always want to try  scuttle that if they can.

36

36.   On or about April 25, 2007, Judge Blitch talked with an unknown male about

traffic tickets WK had received.   Judge Blitch called the clerk's office in Berrien

County and asked them to "hold the citations until he gets there and that maybe he

can get K some relief."

37.   On or about April 25, 2007, ES2 telephoned Judge Blitch about her son JS2

who had a failure to appear warrant pending against him.   Judge Blitch called the

District Attorney's Office to ask that they dismiss the warrant and accept a fine

payment in lieu of mandatory jail time under O.C.G.A. § 40-5-121.   In discussing

the night of JS2's arrest, Judge Blitch stated: "But he got caught over there one

night I want to think it was during, uh, winter or Christmas or something like that

and, uh, he didn't call but he someone else called me that he knew and wanting to

get him out and I spent about three hours that night trying to get hold of CB."   In

discussing the ultimate resolution of the case, Judge Blitch stated the following to

KW, an employee of the District Attorney's Office:   "But I'd like to get something

worked out about reducing that charge on him. . . Yeah and tell CT to help me

work something out to pay it let him pay it we'll work out a fine or something for

him to pay. . . .And then but reduce it so it don't take his license."   Judge Blitch

later dismissed the ticket on his own motion.   The phone calls made by Judge

Blitch to illegally affect the outcome of this case transmitted and caused to be

transmitted in interstate commerce any writing, sign, signal, picture and sound for

the purpose of executing the scheme and artifice to defraud.

38.    On or about April 25, 2007, Judge Blitch telephoned A and D probation, a

private probation company, and instructed probation officers DH and LH to let KC

out early.

39.    On or about May 1, 2007, JP telephoned Judge Blitch concerning a pending

drug case on KM and requested Judge Blitch's assistance. Judge Blitch then

called MR and instructed her "to take care of KM." MR suggested first offender

treatment. KM ultimately received first offender treatment. During the

conversation, Judge Blitch stated: "There's a young lady I'm particularly interested

in. Make sure she doesn't get dropped off the deep end... And, and, and what we

gonna do is gone work out, drop most of the charges, let her plead to one on first

offender... And, uh, plead a nolo, and uh let her pay a fine and work her way out.

. . And we got to find a way to get her out of it okay?" The district attorney had no

knowledge of Judge Blitch's *ex parte* attempts to resolve the case before court.

40.    On or about April 30, 2007, RB telephoned Judge Blitch and requested that

Judge Blitch help get his client, JDH, "sprung a little early." JDH was then serving

a prison sentence for child molestation. Judge Blitch told RB to prepare an order

and send it to him. At the time Judge Blitch issued this order, he knew it to be invalid

38

and stated,  "Uh, well is it gone be up to me or, or . . . it's really up to parole board.

If he is on parole now.  I'm being honest with you.  I'm not trying to. . .walk away.

But they, they don't pay any attention, generally to judges, but let me ask a second

thing.  Is it up to me or is it up to D if, if there's anything could be done."  JDH was

sentenced on April 18, 2005 to fifteen years probation for the offense of child

molestation.  On December 9, 2005, a probation revocation hearing was held and

JDH was revoked for five years to prison and ordered returned to probation

supervision upon his release.  On June 13, 2007, Judge Blitch signed an order

modifying JDH's sentence, it stated that the sentence was modified to one of 15 years

confinement, but that JDH would be released upon service of one year, seven months

and allowed to serve the remainder of his time on probation.  This order resulted in

JDH being released from prison on July 14, 2007.  Judge Blitch modified this

sentence without holding a hearing or giving notice to the district attorney or the

victim.

41.    On or about April 30, 2007, Judge Blitch met with retired game warden, DW.

DW requested that Judge Blitch fix several DUI cases on MB2.  Judge Blitch later

telephoned Judge DP and requested that Judge DP not let MB2 go off to prison,

"Keep him away from a felony, put him on probation and make it so he can get his

license back."  Judge Blitch further stated to Judge DP: "These are important people

who you would want to help who are asking the favor."   The district attorney  had

no knowledge of Judge Blitch's *ex parte*  attempts to resolve the case before court.

42.    On or about May 2, 2007, Judge Blitch had a telephone conversation with

Johnny LNU regarding KH, then charged with drug and firearms charges.  Judge

Blitch stated.  "If I can, if I can get him probation or something like that I'll do it.. .

I can't promise you or not but he ain't going down Friday the worst be is we just can't

work it out, but let's try anyway." The district attorney had no knowledge of Judge

Blitch's *ex parte* attempts to resolve the case before court.

43.    On or about May 2, 2007, Judge Blitch had a face to face conversation with

Atkinson County Deputy Sheriff, EP. EP requested that Judge Blitch help HM  get

out of a DUI.  Judge Blitch stated that he would try to reduce the charges to "public

drunk." The district attorney had no knowledge of Judge Blitch's *ex parte*  attempts

to resolve the case before court.

44.    On or about May 2, 2007, WW telephoned Judge Blitch and requested a

probation bond for her son, DJ.  Judge Blitch refused to assist stating that he "cannot

practice law," and instructed WW to have her attorney file a motion.

45.    On or about May 3, 2007, Lanier County Sheriff NN returned a telephone

call to Judge Blitch.  Judge Blitch instructed Sheriff NN to allow attorney JS to get

out of a misdemeanor charge of obstruction/attempting to elude an officer. Judge

Blitch explained that when law enforcement first told him about the incident he suggested that they take a warrant but later changed his mind upon learning that JS was the defendant, saying, "I tell ya, I said before I really knew who it was, was the way that I put it to him. I said, uh, they asked me what I thought about it if somebody did that. I said well I reckon you'd have to take a warrant for him. I said, I said I suggested a warrant that wasn't really appropriate but they said uh, that obstruction might be in line. I said well whatever, you know. And then they said it was you and I said oh, oh. And then uh ..." Judge Blitch further instructed NN on the ultimate resolution of the matter saying, "Why don't you ... do work something and let him do something and ya'll just hush it up. I wouldn't even do a fine. I'd do something else. Let him apologize or do something."

46.     On or about May 21, 2007, SG2 telephoned Judge Blitch in reference to her grandson, BG, and requested that Judge Blitch release him from jail. BG had been arrested for probation violation and possession of marijuana. Judge Blitch stated he would call SW, BG's probation officer. The next day, Judge Blitch advised deputy sheriff, RC, "to let him out so he can get to work today." Later Judge Blitch telephoned SW and stated, "We will probably just let him serve a few weekends in jail." BG was in fact released from jail. The district attorney had no knowledge of Judge Blitch's *ex parte* attempts to resolve the case before court. These charges were

never referred to the district attorney for prosecution.

47.     On or about May 21, 2007, DJ called Judge Blitch regarding her son, CRJ and his pending child molestation case.  Judge Blitch informed DJ to contact her son's attorney that he cannot have anything to do with her son's case.

48.     On or about May 21, 2007, Judge Blitch received a telephone call from Atkinson County Clerk of Court, WP regarding a pending DUI case against MA the niece of then Clinch County Clerk of Court, DL.  Upon learning that her blood alcohol reading was .189, Judge Blitch told WP, "I think we're probably gonna have to work her around to, uh, you know, give her a drivin' permit or somethin' but I don't think there's any way out of that, but I'll talk to 'em.  I'll see."  On or about May 23, 2007, Judge Blitch received a telephone call from DL about the pending DUI against MA.  During this conversation, Judge Blitch stated, "I don't know, you know, how far we can go with it other than I know I can give her a permit to drive I'm not worried about that. . . And uh CH's gone be eye-ballin' it you know. . . 'cause of you and me. . . Tell him that, that the worst can, is gonna happen is she'll plead nolo to it. . . And pay a fine and I'll give her a permit to drive. . .Tell him that's the worst and if we can do any better we'll try but don't count on it because of the DA. . If it had been 1-1, I'd have done it in a heartbeat and I wouldn't care what CH said but when they jump uh when WP says 1-8-9.  I

said lord a mercy. . . Tell him we'll try but not, she'll be able to drive I can't

promise him how it's gonna turn out because of CH but we'll work on it." The

district attorney had no knowledge of Judge Blitch's *ex parte* attempts to resolve

the case before court.

49.     On or about May 22, 2007, Judge Blitch called the Cook County Clerk of Court

and then the Cook County Sheriff's Office with regard to a traffic citation issued

against AS2. Judge Blitch advised the Cook County Sheriff's Office to place the

ticket in "C's (SCB) pile" because "[he'd] like to get rid of it tomorrow." This ticket

was later dismissed.

50.     On or about June 6, 2007, Judge Blitch spoke with attorney GM about fixing

several pending DUI cases. In discussing one of the DUI charges the two had the

following conversation:

GM:     Uh would it be possible you think we might be able to do something with
        the M woman?
JB:     I. . yeah if you'll. . . let me tell you what if uh what you need to do is . . I
        need to meet with you
GM:     Alright
JB:     Like Friday
GM:     Alright, Sir.
JB:     and go over these things
GM:     Yes, Sir.
JB:     And then do that in private.
GM:     Yes, Sir.
JB:     You might be better if you come down here
GM:     Alright

JB:     Let me. . . rather than getting caught up there
GM:    Yes, Sir.
JB:     I will be there then that's when we get rid of it, but let's get the thing . . what
        you do if you come call me and get down here Friday.
GM:    Yes, Sir.
JB:     And bring me a proposed order
GM:    Alright, Sir
JB:     And then we'll just hold it next Tuesday in uh and get it worked out I'll help
        . . .we'll go over it Friday what's gonna happen alright?
GM:    Yes, Sir.  Yes, Sir. "

On or about June 8, 2007, the following Friday Judge Blitch met in his

office with GM about the previously referenced DUIs. First, GM reported that he

had followed through on Blitch's earlier request to determine whether or not

Berrien Sutton was certified as State Court Judge and informed Judge Blitch that

Sutton was certified as to the State Court judgeship. GM then told Judge Blitch

that he had four DUI cases that he needed the judge to take care of.  During this

discussion, Judge Blitch said:  "What we do, uh, I, I'll, let me tell you something.

I'm gonna get you out of P and that nurse, uh, the girl, and, what's the other one?"

The district attorney had no knowledge of Judge Blitch's *ex parte* attempts to

resolve the cases before court.

51.     On or about June 6, 2007, Judge Blitch met with JH. JH was inquiring about

a DUI he received in Lowndes County.  Judge Blitch directed JH to see the public

defender in Valdosta saying that the judge that JH would appear before is the father

of the public defender and that was probably the best way to handle the case. Judge

Blitch said it is not in his circuit and "he could be in trouble so he should not be

involved."

52. On or about June 8, 2007, MW called Judge Blitch about the early release of

her son, DP2. Judge Blitch stated that he would release DP2 early from the

sentence that he had imposed. MW also asked that Judge Blitch contact another

judge who had sentenced her son and request early release from that sentence as

well. Judge Blitch stated: "No, Ma'am. I, I, don't have, you know, I, I, I wouldn't

let a judge call me. I can't call him. . . I just can't do that. Don't do that. I don't

know...Well, I'll do that but I can't, honey, I can't do that with Judge J. I, I, I, he

would be offended and he, uh, I and frankly I think it's illegal. I just can't do that."

On June 14, 2005, DP2 was sentenced to ten years probation for Burglary and

Theft by Taking. On October 31, 2006, DP2, was revoked for 720-730 days to the

probation detention center. On June 18, 2007, Judge Blitch ordered DP2's early

release from the detention center. The district attorney had no knowledge of Judge

Blitch's *ex parte* attempts to resolve the case before court.

53.    On or about June 11, 2007, Atkinson County Magistrate Judge, HJ, phoned

Judge Blitch on behalf of her friend, JM3, who then had a DUI pending in the

Superior Court of Berrien County. Judge Blitch indicated that he would sentence

JM3 to rehabilitation without hearing any evidence, considering the past record of

the defendant or giving notice to the district attorney. The district attorney had no

knowledge of Judge Blitch's *ex parte* attempts to resolve the case before court.

The phone calls made by Judge Blitch to illegally affect the outcome of this case

transmitted and caused to be transmitted in interstate commerce any writing, sign,

signal, picture and sound for the purpose of executing the scheme and artifice to

defraud.

54.     DM had been sentenced on November 2, 1998 to ten years probation for

enticing a child for indecent purposes. In the spring of 2006, DM was charged in a

new rape case in Atkinson County. As a result of this new charge, Probation officer

JD prepared a petition for probation violation and warrant for the arrest of DM in

connection with his 1998 conviction. Upon taking the documents to Judge Blitch for

signature, Blitch instructed JD to go meet with Sutton about the matter. At the time

DM was represented by Berrien Sutton on a medical malpractice case. Sutton then

contacted attorney JT and asked him to represent DM on a habeas corpus petition to

set aside the enticing a minor conviction. Sutton prepared all the paperwork and did

all the legal research for JT. On June 15, 2006 a hearing was held on the habeas

motion and the following day the conviction was set aside. This conviction being

set aside was a benefit for Berrien Sutton in the civil litigation in which he

represented DM and was done without notice to the district attorney or the victim about Blitch's *ex parte* involvement in the resolution of the case prior to the hearing.

55.     At a date shortly before November 6, 2006, BB, IV suggested to attorney JT2 that JT2 file a writ of mandamus against the City of Homerville for its refusal to issue a beer and wine license to Hoagie's. JT2 then filed a petition for a writ of mandamus as suggested by BB, IV. Shortly thereafter, on or about November 6, 2006, Judge Blitch granted a Petition for a Writ of Mandamus ordering the City of Homerville to issue a beer and wine license to Hoagie's Restaurant. Judge Blitch made this judicial decision based on relationships with friends and family.

56.     On or about December 8, 2004, defendant JC was arrested for felony child abuse. Later that same day Magistrate Judge EG denied bond to defendant JC on the grounds that defendant JC was a threat to the community, to himself or his child. That same evening JT called Judge Blitch at his residence requesting that JC be released on bond. The same evening, Judge Blitch telephoned Magistrate EG and ordered her to release defendant JC on bond. Magistrate EG refused to do so. The next day, Judge Blitch personally traveled to the Cook County jail and, without holding a hearing or taking evidence, signed bond paperwork releasing defendant JC. The district attorney had no knowledge of Judge Blitch's *ex parte* attempts to resolve the bond issue.

57.    Beginning in or about September 2003, and continuing until about March 2006, Judge Blitch took improper judicial action with respect to the criminal case then pending against NGH, IV (a/k/a "B"). In September 2003, NGH, IV was arrested for felony drug and obstruction charges. Judge Blitch called jail officials and ordered the release of NGH, IV without a hearing. At a pre-trial hearing in 2005, Judge Blitch told District Attorney D.F., "You know B is my best friend's son. I'll tell you right now, I'm not sending him to prison period." In August of 2005, NGH, IV was convicted in Cook County of felony charges of burglary and forgery, and in Berrien County of forgery. Judge Blitch sentenced NGH, IV to serve eight years on probation. In March 2006, Judge Blitch terminated NGH, IV's probation without notice to the district attorney.

58.    On September 30, 2004, WDC was sentenced to five years probation. WDC was later revoked and sentenced to the detention center. During WDC's incarceration, Judge Blitch hired WDC's father, LC2 to clear land. On November 16, 2006, Judge Blitch signed an *ex parte* order releasing WDC from custody without notice to the district attorney.

59.    In November 2001, Judge Blitch met with defendant HL, then charged with aggravated assault. HL was seeking Blitch's assistance in his upcoming aggravated assault case. Thereafter, HL was sentenced to a term of two years in the detention

48

center and the remainder of ten years on probation. As the two were leaving the

courtroom, Blitch assured HL that he would release him after serving only one year.

Thereafter, Blitch did modify HL's sentence and release him early. Further, HL was

to make restitution payments to the victim for $10,000 of medical bills associated

with the gun shot wound suffered during the aggravated assault. Approximately

eighteen months after his early release from the detention center, HL went to see

Blitch about the restitution. Blitch removed this condition from HL's probation. HL

had made no restitution payments.

60.    On or about December 15, 2004, Judge Blitch entered an *ex parte* order

terminating the probation of convicted child molester, CW. The order of termination

stated that CW was to be "released and forever discharged from said sentence and

probation." CW had entered a guilty but mentally ill plea on October 5, 1989, to

child molestation. After serving approximately 10 years in prison, CW was released

on probation. CW made contact with Blitch and asked that his probation be

terminated. Judge Blitch issued this order without notice to the district attorney or

the victim and without holding a hearing.

61.    On or about February 20, 2006, PP was convicted of arson and sentenced by

Judge Blitch to a sentence of 420-540 days in the detention center. On December

22, 2006, Judge Blitch called the secretary of counsel for PP and dictated an order

for PP's release. This order was faxed from counsel to Judge Blitch. This modification was made without notice to district attorney or holding a hearing.

All in violation of Title 18, United States Code §§ 1341, 1343, 1346, 1349 and 2.

## COUNT TEN
### Extortion by a Public Official - Brooks E. Blitch, III
### 18 U.S.C. §§ 1951 and 2

1.    Paragraphs 1-15 of the Introduction are incorporated herein by reference.

2.    LP served as an Associate Magistrate Judge in Clinch County for approximately nineteen years.

3.    ETS was a private citizen who managed certain commercial real property for the owner of the property (the "owner.")

4.    BB, IV leased this property and stored certain commercial equipment including a piece of logging equipment called a grapple. The equipment was an instrumentality of and used in interstate commerce, in particular the logging business.

5.    Both Judge Blitch and BB, IV had a financial interest in the equipment.

6.    BB, IV owed approximately $900 in back rent on the real property where the equipment was stored.

7.    On or about December 1, 2006, the exact date being unknown, the owner of the

50

property asked ETS to remove certain items of personal property owned by Judge

Blitch and his son, BB, IV from the property.

8.     Thereafter, ETS, and another person at his direction, began removing and

dismantling the items of personal property.

9.     On or about December 19, 2006, Judge Blitch personally confronted ETS at

the location of the real property cursing and yelling at ETS, and threatened legal

action if ETS did not pay him and BB, IV a sum of money, the estimated value of the

disputed property.

10.    Judge Blitch later wrote to the Judicial Qualification Commission concerning

this incident that "I was upset and profane, as we caught the 'individual' in the act of

theft."

11.    On or about December 19, 2006, Judge Blitch met with Clinch County Chief

Magistrate Judge ARS and demanded that she take judicial action against ETS.

12.    Judge Blitch requested that Magistrate Judge ARS issue a warrant against

ETS.

13.    Judge Blitch stated that BB, IV was the owner of the equipment in dispute.

Judge Blitch did not disclose that he had a financial interest in the equipment in

dispute.

14.    Magistrate ARS then told Judge Blitch that only the owner of the property

could seek judicial action from her office.

15.    Magistrate LP was present in the office and overheard a portion of ARS's conversation with Judge Blitch.

16.    Thereafter, BB, IV came to the office of the Magistrate Judge and filled out an application for the arrest of ETS.

17.    Magistrate ARS told Magistrate LP that she (ARS) would not hear the case because of the apparent conflict of interest. ARS suggested that they contact an out-of-town magistrate judge to hold the hearing. Later, Magistrate LP volunteered to conduct the hearing.

18.    On or about December 22, 2006, Magistrate LP held a hearing on the arrest warrant application against ETS.

19.    After the hearing, Magistrate LP told ETS that she would issue a warrant against him. Magistrate LP further stated that ETS could avoid arrest and incarceration if he immediately went and got payment in the amount of $4,000 in favor of BB, IV.

20.    ETS went and got monies in the amount of $3,100 ($4,000 minus the back rent owed) which he paid to BB, IV.

21.    Thereafter, on or about December 29, 2006, Judge Blitch promised to reinstate Magistrate LP as an Associate Magistrate Judge of Clinch County.

22. On January 2, 2007, Judge Blitch issued an order reinstating Magistrate LP as a full-time magistrate judge. Magistrate LP's reinstatement resulted in her receiving a $14,000 per year raise.

23. When asked by Magistrate CH what had happened to change Judge Blitch's mind about reinstating her as a full-time Magistrate, LP replied, " I guess, I got back in his good graces."

24. On or about January 13, 2007, LP prepared a letter which Judge Blitch submitted to the Judicial Qualifications Commission in support of Blitch's response to a complaint against him filed by Berrien Sutton. LP's letter was not consistent with the actual events which occurred at the hearing on December 22, 2006.

25. The Office of the Magistrate Judge of Clinch County, Georgia, the Alapaha Judicial Circuit, the Clinch County Commission, the logging interests of Judge Blitch and of BB, IV, ETS's activities in managing commercial real estate and ETS's bank account, and the interest of the owner of the commercial property were all involved in activities which affected interstate commerce.

26. On or about June 8, 2007, Magistrate LP and Judge Blitch met in Judge Blitch's chambers to discuss LP's upcoming testimony before the Federal Grand Jury in Macon regarding the ETS matter.

26. From on or about December 19, 2006, until on or about June 13, 2007, in

53

the Valdosta Division of the Middle District of Georgia, and elsewhere within the

jurisdiction of this Court, the defendant,

## BROOKS E. BLITCH, III,

did aided and abetted by persons known and unknown to the grand jury,

knowingly,willfully and unlawfully affect and attempt to affect interstate commerce

by extortion, in that the defendant unlawfully obtained  monies from ETS, with his

consent, induced by wrongful use of actual and threatened fear of economic harm,

and under color of official right.

All in violation of Title 18, United States Code §§ 1951 and 2.

## COUNT ELEVEN
### Conspiracy to Commit Mail Fraud
### Brooks E. Blitch, III and Berrien Sutton
### 18 U.S.C. §§ 1341 and 1349

**I.    Introduction:**

At all times relevant to Count Eleven of the Indictment:

1.    Paragraphs 1-15 of the Introduction  are incorporated herein by reference.

2.    Defendant Berrien Sutton was the State Court Judge in Clinch County.

Defendant Sutton was also the County Attorney for Clinch County.

3.    DL was the elected Clerk of Court of Clinch County.

4.    MD2 was a Deputy Clerk of Court.

5.      SS2 was a Clinch County Sheriff's Deputy.

6.      The duties of the Clerk of Court include receiving fines, assessments and restitution in criminal cases and thereafter distributing the monies collected according to law.

7.      The salary of the Clerk of Court is established by legislation passed by the General Assembly of the State of Georgia, and the Clerk is prohibited from receiving additional fees in payment for services.

8.      The O.C.G.A. § 15-6-77(k) states in particular: "No fees, assessments, or other charges may be assessed or collected except as authorized in this code section or some other general law expressly providing for the same."

9.      The salaries of county employees MD2 and SS2 were established by the Clinch County Commission.

10.     Beginning on or about June 1, 1992, Judge Blitch and Judge Sutton issued a judicial order imposing a $15 fee or assessment (hereafter the "fee(s)") on defendants in criminal cases in the Clinch County Superior Court and the Clinch County State Court.

11.     The stated purpose of the 1992 order was to compensate certain county employees for their duties in supervising and managing misdemeanor probation cases.

12.    During the period from approximately July 1, 1992, until approximately August 6, 2001, supervision of misdemeanor probation cases was, in fact, handled by Clinch County employees.

13.    There was no statutory or other legal authority for the orders Judge Blitch and Judge Sutton issued in July of 1992.

14.    O.C.G.A. § 15-6-77(c) mandates that fees paid to the Clerk of Court shall be remitted to the county treasury.

15.    On or about August 6, 2001, the Clinch County Commission voted to hire a private probation company to supervise misdemeanor probation cases and to discontinue the assessment of the fees.

16.    On September 13, 2001, Judge Blitch signed another written order authorizing the collection of a fee of $10 per criminal defendant in Clinch County and the distribution of the money collected to the co-conspirators.

17.    From August 6, 2001, until January 9, 2007, Judge Blitch, Judge Sutton and Clerk DL and others continued to impose and collect the fees in misdemeanor criminal cases, in violation of the Official Code of Georgia Annotated and in violation of the directive of the Clinch County Commission.

18.    Judge Sutton imposed the fee in numerous misdemeanor cases.

19.    During this six year period Judge Blitch and Judge Sutton, together with other

co-conspirators, unlawfully collected and caused the collection of $76,283 from

misdemeanor probationers. $73,286 of this total was disbursed to co-conspirators DL,

SS2, MD2 and other county employees.

20.    On or before January 9, 2007, the Clinch County Commission discovered that

contrary to their August 6, 2001, vote and directive, Judge Blitch and Judge Sutton

had continued to impose the unauthorized fees.

## II.    The Conspiracy to Defraud:

21.    Beginning on or about September 10, 2001, and continuing until on or about

January 9, 2007, in the Valdosta Division of the Middle District of Georgia and

elsewhere within the jurisdiction of this Court, the defendants,

### BROOKS E. BLITCH, III and BERRIEN SUTTON,

conspired, combined, confederated, agreed and had a tacit understanding with one

another and with others whose identity is known to the grand jury, to devise a scheme

and artifice to defraud and attempt to defraud  and obtain and attempt to obtain

money by means of false and fraudulent pretenses and representations and the

omission of material facts and for the purpose of executing such scheme or artifice,

and attempted so to do, placed in any Post Office or authorized depository for mail

matter, any matter or thing whatever to be sent or delivered by the Postal Service, and

by any private or commercial interstate carrier, and caused to be deposited or

delivered, any such thing according to the direction thereon, and took and received therefrom any such matter or thing.

## A. Objects of the Conspiracy:

22.    It was an object of the conspiracy to use the authority of State and Superior Courts of Clinch County to compel defendants with misdemeanor cases to pay an illegal and unauthorized fee, and thereafter, to distribute the monies collected for the benefit of the conspirators.

23.    It was further an object of the conspiracy to hide the existence of the bank account containing the unlawfully assessed fees from the Clinch County Commission.

24.    It was further an object of the conspiracy that the collection of these unauthorized fees would and did give Judge Blitch authority over additional monies which could be  given out solely at his discretion.

## B. Manner and Means of the Conspiracy:

It was part of the manner and means of the conspiracy that the co-conspirators would and did:

25.    Issue and enforce judicial orders that had no legal basis or lawful authority in order to justify the collection of fees from criminal defendants.

26.    Use the offices of the Superior Court, State Court and Clerk of Court of Clinch County to collect and receive the fees from misdemeanor criminal defendants.

27. Set up a separate bank account where the unlawful fees would be deposited.

28. Distribute the monies to certain of the co-conspirators as if the monies were legitimate income to the recipients.

29. Fail to withhold federal and state taxes and other obligations on the monies distributed.

30. Fail to issue W-2 and 1099 Forms or other tax documents to the recipients of the monies.

31. Hide the existence of the fund from the Clinch County Commission, including its accountant and auditor.

32. Use the United States Postal Service to send court notices to defendants, and to receive correspondence and payments, including payments of the unauthorized fees from misdemeanor criminal defendants.

## C.   Overt Acts:

In furtherance of the conspiracy the defendants and their co-conspirators committed the following overt acts:

33. On or about July 1, 1992, Judge Blitch and Judge Sutton issued a joint judicial order imposing the previously described administrative fee.

34. On or about September 10, 2001, Clerk DL opened account # 203152605, entitled "Clinch Misdemeanor Probation," a bank account at the Clinch Banking

59

Company, Homerville, Georgia, for the purpose of receiving the illegal fees from misdemeanor defendants in Clinch County. The existence of this bank account was concealed from and not disclosed to the Clinch County Commission.

35.     On or about September 13, 2001, Judge Blitch  issued another written order authorizing the collection of a fee of $10 from criminal defendants in Clinch County, and the distribution of the monies collected to certain of the co-conspirators.  This order stated that the fees were to be kept in a separate bank account.  This order was concealed from and not disclosed to the Clinch County Commission.

36.     From September 13, 2001, until January 9, 2007, defendant Berrien Sutton in his capacity as State Court Judge signed approximately 7000 final dispositions and/or bond forfeitures in misdemeanor cases ordering the payment of the unauthorized fee.


37.     From on or about July 1, 1992, until January 9, 2007, the co-conspirators ordered, collected, and then distributed the fees from misdemeanor defendants.

38.     During the conspiracy, Judge Blitch periodically issued other written orders purporting to authorize particular payments to certain of the co-conspirators. These orders were concealed from and not disclosed to the Clinch County Commission.

39.     During the period from September 13, 2001, through January 9, 2007, none of the co-conspirators disclosed the assessment of the fees or the existence of the

account to the Clinch County Commission or to the accountant who performed yearly

audits of Clinch County bank accounts.

40.    Clerk DL failed to withhold federal and state taxes and other benefits from the

monthly checks he issued from the Misdemeanor Account.

41.    According to the terms of the order issued by Judge Blitch, Clerk DL, MD2,

SS2, and other county employees received the proceeds of these unauthorized

assessments in monthly allotments in addition to their authorized official salaries.

All in violation of Title 18, United States Code §§ 1341 i/c/w 1349.


## COUNT TWELVE
### Perjury - Hayward Collier
### 18 U.S.C. § 1623

At all times relevant to Count Twelve of the indictment, Defendant Hayward

Collier lived in Nashville, Berrien County, Georgia.

On June 13, 2007, in the Macon Division of the Middle District of Georgia,

and elsewhere within the jurisdiction of this Court, having taken an oath to tell the

truth under penalty of perjury, before a Grand Jury of the Middle District of Georgia,

United States, the defendant,

## HAYWARD COLLIER,

knowingly, and contrary to the oath, made the following false material declarations

in response to the following questions posed by the federal prosecutor before the

grand jury of the Middle District of Georgia:

**First Specification of Perjury: Purpose of the Visit**

**Q:** What did ya'll go to see the Judge [Blitch] about? [GJ: 7]

**A:** I just took her (CS) over there. **I don't know what her and Judge Blitch talked about.** I'd be lying. I took her over there. She said she wanted to talk to him, talk to Judge Blitch, so I said, "I've got to go over there anyway because I need to talk to him." So we went over there, but I didn't stay in the office when they talked.

**Q:** So you took her over there? You sat outside in his office or walked around?

**A:** No, Ma'am. I sat out there and talked to the secretary.

**Q:** And you don't have any idea what it was she wanted?

**A:** **No, Ma'am, she didn't discuss that with me.** [GJ:7]

**Q:** Did you tell her how Judge Blitch would go about helping her with the case? [GJ: 27]

**A:** **No, I didn't.** Like I told her, she needed to talk to Judge Blitch by herself; **I didn't want to know what was going on.** And the secretary there will tell you that I sat on the outside. [GJ: 27]

When in truth and in fact, as defendant Collier then and there well knew and

believed, the foregoing answers set forth in bold face were false and that he knew the

purpose of the trip to Blitch's office, as defendant Collier admitted in a tape recorded

conversation in which he and CS discussed the purpose of the visit as follows:

**HC:** I told you's a church woman and I told him I didn't know what you wanted to talk to him about, but I do know that I'm going to let you do the talking to him cause he'll knows he'll listen to women.

**CS:** Uh, huh.

**HC:** I'll tell you no.

**CS:** They say he like women.

**HC:** He listen to women now. He'll listen, all you got to do is talk to him and talk

to him and tell him.  See (Unintelligible) just be straight forward because he's going to call the probation office now.

CS:  Uh, hum.

HC:  You got to be straight forward with him.  Straight forward with him.  I'm telling you tell him like ya'll got children.  Tell him you got children, shit.  Tell him y'all got two children, shit.  You know what I'm saying.  Just let him know things got a little out of whack.  You know you got a little money to pay part of his probation so he can get out.  Tell him you got him a job.  Tell him you got a job waiting on him at D&H out there with you.  Tell him, you know.  See his parole done ran out.

CS:  Uh, hum.

HC:  Probation is one they got the thang on.

CS:  Uh, hum.  (Unintelligible).

[. . .]

HC:  He ain't gonna get fresh with you.  He going a, he'll help you.  Judge Blitch (Unintelligible) he'll help a brother, too, see.

[. . .]

HC:  Yeah, he the type of person that's what I'm telling you now all you got to do is play that religion role with him.

CS:  Oh, okay.

HC:  I'm telling you now (Unintelligible) .  You pay the probation fine, how much you say about $6,000?

CS:  It's about it's 48 on one and uh...

HC:  (Unintelligible) ....I can pay half of it $4,800 I can pay half of the probation (Unintelligible) up to $2,400 (Unintelligible) talk to him.  He gonna listen.  He gonna call the probation officer.  Anything you tell him he's gonna turn around and call that probation officer.  I'm telling you what he gonna do.  He got to go probation office to get him out.

CS:  Um, hum.

HC:  He can overrule it but he got to do it in a respectful way . . .

CS:  Yeah.

HC:  . . . with them.  Yeah, Adel is the jail, right?

CS:  Yeah.  I got to pay, uh, the other probation, too,  LH.

HC:  I wouldn't worry about it.  L ain't got no hold on him.

CS:  Yep, I think she do but I know it's mainly on.......

HC:  What (Unintelligible).

CS:  No he got on with L last year and year before last.

HC:   But that's since he been out? (Unintelligible).
CS:   Yeah. (Unintelligible) She called that...that victim impact place? She
      wanted all that stuff. I ain't never been over here.
HC:   (Unintelligible) L want that money.
CS:   Um, hum.
HC:   You only owe about what about?
CS:   Fourteen hundred she wants.
HC:   Good God almighty.
CS:   I don't even know where the $1,400 come in at.
HC:   Oh, that's because you have to pay so much for being on probation now. I
      think you have to pay $33 per month to be on probation. Get ready, get
      ready now (Unintelligible) in here turn right here by the court house. The
      courthouse here on the left, you'll see it. There the courthouse, that first
      road to your right, I mean left.

**Second Specification of Perjury:  Method of Transportation**

Q:   Did you and she ride over from Nashville together, or did ya'll meet up?
     [GJ: 9]
A:   **No, I drove my own vehicle**.
Q:   She met you over there?
A:   **She followed me.**
Q:   So ya'll wouldn't have had the chance to make any discussion while you were
     in the car then because ya'll were in separate cars?
A:   **Yes, Ma'am**.
Q:   Just a few follow-up questions. When you met with CS where were you to see
     Judge Blitch? Where were ya'll traveling from? [GJ: 26]
A:   **She came to Nashville, she followed me.** When I left there, I had to go to
     Valdosta.
Q:   Do you think your memory might be mistaken, that ya'll in fact rode in the
     same car?
A:   **No. She didn't ride in no car with me.** [GJ: 26]
Q:   Could you be mistaken about that? [GJ: 27]
A:   I'm not gonna ride with no woman in the car with me. My wife won't . . . I
     wouldn't do that.

     When in truth and in fact, as defendant Collier then and there well knew and

64

believed the foregoing answers set forth in bold face were false and that he did ride

in the same vehicle with CS on their way to meet Judge Blitch:

CS:  There ain't none in there.  Let me tell you.  I thought you were driving your
     vehicle.
HC:  No, I was gonna ride with you.
                              [. . .]
HC:  Oh, that's because you have to pay so much for being on probation now.  I
     think you have to pay $33 per month to be on probation.  Get ready, get
     ready now (Unintelligible) in here turn right here by the court house.  The
     courthouse here on the left, you'll see it.  There the courthouse, that first
     road to your right, I mean left.


**Third Specification of Perjury: Exchange of Money**

**Q:**  Did you take anything from her or anybody else in exchange for introducing
     them to the judge?
**A:**  **No, Ma'am**. [GJ: 9]
**Q:**  Did you take some money from her (CS)? [GJ: 27]
**A:**  **No, Sir**. [GJ: 26]
**Q:**  Is it possible you did, but you've forgotten?
**A:**  We always swap money.  I mean I give her money.
**Q:**  But that's not what I'm saying, did you take money from her?
**A:**  **Not at the time, she had talked to the judge, now**.  I might get $10 from her,
     $20 from her, and she might get it from me.  But that's just as far as that goes.
**Q:**  That's not my question. My question is, did you take about $350 from her to
     meet with Judge Blitch?
**A:**  **No, Sir.**
**Q:**  Are you sure you might not - - ?
**A:**  **No, Sir.  I'm sure of that now**.  Because if it's $350, you'll know that you
     took that. [GJ: 27]


     When in truth and in fact, as Defendant Collier then and there well knew and

believed the foregoing answers set forth in bold face were false and that he did take

$350 from a CS in exchange for setting up a meeting with Judge Blitch at which she

requested that Judge Blitch release a criminal defendant, her boyfriend, MAH from

jail and engaged in the following conversation while the money was exchanged:

CS:   How much you want?
HC:   Whatever you give me.
CS:   laughs.
HC:   Whatever you give me. I'm gonna take what ever you give me, take whatever
      you give me.  I ain't gonna be greedy whatever you give me I'm a take . . sure
      is. Been good to me now, sure been good to me, my best friend

**Fourth Specification of Perjury: Don't say anything about money**

Q:   CS, the lady from the prison, or anybody else that you have gone to see Judge
     Blitch about, have you ever told them something to the effect of, "Don't
     mention anything about any money to Judge Blitch, because he'll have mine
     and your asses both locked up?" [GJ:28]
A:   **I don't remember that. I'll be honest with you, I don't remember that.
     If I did, I don't remember saying that.**
Q:   So you don't remember saying it to anybody, ever?
A:   **No, Ma'am**.
Q:   Do you specifically [remember] saying it to CS?
A:   I **can't remember saying nothing about it. We didn't talk about no
     money now.  I might be wrong, but I just don't remember me and her
     talking about no money.**
Q:   Now you said earlier, if she would have given you something like $300-
     $350 dollars, you'd remember that.
A:   That's what I'm saying. [GJ: 29]
Q:   So if ya'll had a discussion about her giving you that much, you'd remember
     that, too, wouldn't you?
A:   **Yeah, but she didn't give me no money like that right there.** [GJ: 29]
When in truth and in fact, as defendant Collier then and there well knew and

believed, the foregoing answers set forth in bold face were false in that Collier had

a conversation with CS in which he stated to her:

HC:. Now, don't say nothing to Judge Blitch about no money.
CS:   All right, I won't.
HC:   Okay, let me tell you, the only money you're gonna mention about you is
      that you gonna pay that probation . . .
CS:   Alright.
HC:   Whatever you gonna pay, how much you think you're gonna pay.   You
      start talking about money he'll probably get me and your ass both locked up.
      Start thinking we're trying to buy the Fibbies

**Fifth Specification of Perjury:  Method of Helping with Case**

**Q:**   Did you tell her how Judge Blitch would go about helping her with the case?
        [GJ: 27]
**A:**   **No, I didn't**.

        When in truth and in fact as Defendant Collier then and there well knew and

believed the foregoing answer was false in that  he had told CS the following before

their meeting with Judge Blitch:

HC:   He listen to women now.  He'll listen, all you got to do is talk to him and talk
      to him and tell him.  See (Unintelligible) just be straight forward because he's
      going to call the probation office now.
CS:   Uh, hum.
HC:   You got to be straight forward with him.  Straight forward with him.  I'm
      telling you tell him like ya'll got children.  Tell him you got children, shit. Tell
      him y'all got two children, shit.  You know what I'm saying.  Just let him know
      things got a little out of whack.  You know you got a little money to pay part
      of his probation so he can get out. Tell him you got him a job. Tell him you got
      a job waiting on him at D&H out there with you.  Tell him, you know. See his
      parole done ran out.
CS:   Uh, hum.
HC:   Probation is one they got the thang on.
                          [ . . .]

                             67

HC: (Unintelligible) ....I can pay half of it $4,800 I can pay half of the probation (Unintelligible) up to $2,400 (Unintelligible) talk to him. He gonna listen. He gonna call the probation officer. Anything you tell him he's gonna turn around and call that probation officer. I'm telling you what he gonna do. He got to go probation office to get him out.

CS: Um hum.

HC: He can overrule it but he got to do it in a respectful way.

## Sixth Specification of Perjury:  Helping DJM

Q: And other than this corrections officer who was a friend of yours from school and CS, who else have you gone to see the judge about? [GJ:10]

A: **Just me.  Just about my problems**.

Q: Do you know a fellow by the name of DJM from there in Nashville?

A: DJM.  I know a M.  Wait a minute.  Let me think of this boy's name.  BM.

Q: Did you go to see the judge about him?

A: No, Ma'am.

Q: Do you know a fellow whose name is DJM, however his first name may be pronounced D or D who got arrested for drugs by ROB?

A: That's who you are talking about.

Q: You think his name is B?

A: DM.  That's the only M I really know.

Q: And he got arrested for drugs by the local deputy, ROB?

A: I know he was on probation for drugs.  I don't know who arrested him, now but I know he was on probation.

Q: And how old of a fellow is this M that you're speaking of?

A: About 21 or 22.

Q: You don't know any younger Ms 17 or 18 years of age that you've been to see the judge to get a bond for?

A: **No, Ma'am**.

Q. Do you know an attorney, JS?

A: I know JS.

Q: How do you know JS?

A: Because he is my attorney.

Q: Have you ever arranged between JS and Judge Blitch to set up a plea on anybody to include DJM?

A: No, Ma'am.  Hold it now.  Just one minute.  Let me make sure I get my head

in what you're saying. **Me and JS, when I talk to JS, that would be about my family. I don't get him to talk about somebody else's family**.

Q:    The M family?

A:    Right, I talk to JS, because I see him about my problems.

Q:    So you've never taken anybody with you to say, JS has got the judge's ear and you ought to use him as your lawyer because he can work it out for you or something to that effect?

A:    **No, Ma'am. I ain't never told anybody about JS. No.** The only thing that I ever said was the judge will be able to listen to you; if you want to talk to you, he'll listen to you. Now, I'll tell anybody that. He'll listen. He'll give you his honest opinion. He'll say, I can't do that and he'll tell you if could do something to help your case. But if he can't, he'll say he can't.

When in truth and in fact as Defendant Collier then and there well knew and

believed the foregoing bolded answers were false in that he had contacted Judge

Blitch on behalf of DJM to arrange release on bond and that he told CS about it as

follows:

CS:    When they gonna let J out?

HC:    J? I don't know. I might ask him while I'm over here about her bond.

CS:    Oh, she ain't got a bond yet?

HC:    Yes, she got a thirty thousand dollars cash.

CS:    Why they got a cash bond for?

HC:    This woman up here she's new and that's what she's doing to everybody.

CS:    For real?

HC:    Yeah, about these bonds.

CS:    Uhm, Uhm Um, be and they should (Unintelligible) drop it down to a property.

HC:    Yeah, I got little D's dropped down to a property yesterday.

CS:    For real.

HC:    (Unintelligible) got him out. I ain't signing nobody bond, I'll you know get it dropped down. . .

CS:    Yeah, yeah.

HC:    and shit. Little boy, I tell you what, he was right out there last night right

there with them same damn boys.

CS: What? He wasn't with that girl he go with?

HC: He with them boys, hell he was with his boys last night, they were smoking and shit. I say god damn, he needs to have a little common sense . . .

CS: He just got out!

HC: . . . and chill out for a minute. You go it this way. Out there smoking weed and shit. I'd say shit god damn them boys. I'd be done got my woman and try to chill out and get up this morning and went out there to Chaparral trying to get me a job. He'd better have a job before he goes to court but see that what he don't understand. Them crackers they gonna stick something in his ass.

All in violation of Title 18, United States Code § 1623.

### COUNT THIRTEEN
### Retaliation Against a Witness – Brooks E. Blitch III
### 18 U.S.C. § 1513

## Introduction to Counts Thirteen and Fourteen

1.    Paragraphs 1, 6 and 10  of the Introduction are incorporated herein by reference.

2.    WB served as a Special Agent with the Georgia Bureau of Investigation (hereinafter "GBI") for more than  20 years.

3    WB retired from the GBI on November 30, 2005 .

4    After his retirement from the GBI, WB sought employment in local law enforcement in two south Georgia cities, Nashville, and Adel. Both cities are within the Alapaha Judicial Circuit.

5.    While a Special Agent with the GBI, WB assisted in the investigation and

prosecution and conviction of BB for insurance fraud related to the arson of Blitch Ford. BB is the son of Judge Blitch. Blitch Ford was owned by BB and Judge Blitch's wife, PB.

6.      While a Special Agent with the GBI, WB also assisted in the investigation and prosecution of two south Georgia sheriffs for the cultivation and distribution of marijuana.

7.      On or about May 13, 2004, Judge Blitch telephoned the City Manager of the City of Adel, Georgia, JP, and urged him not to allow the City of Adel to hire WB as Police Chief.

8.      On or about August 23, 2004, Judge Blitch called MD3, a County Commissioner of Cook County, and urged him to tell JP not to hire WB.

9.      In particular, defendant  Judge Blitch urged MD3 and JP not to hire WB because of his role in the investigation and prosecution of  a) BB for mail fraud i/c/w the arson of "Blitch Ford," a violation of 18 U.S.C. §§ 1341 and1343, Case No. 98-CR-20-HL,  and b) an investigation in 2001 of the sheriffs of Coffee and Atkinson Counties, United States v. Carlton Evans  Case. No. 99R00609. a violation of 21 U.S.C. § 841, et seq.

On or about May 11, 2004, and continuing until on or about August 23, 2004, in the Valdosta Division of the Middle District of Georgia, and elsewhere

71

within the jurisdiction of this Court, the defendant,

## BROOKS E. BLITCH, III,

did knowingly, with intent to retaliate, take any action harmful to any person, including interference with the lawful employment and livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any federal offense.

All in violation of Title 18, United States Code § 1513(e).

### COUNT FOURTEEN
### Retaliation Against a Witness – Brooks E. Blitch III
### 18 U.S.C. § 1513

1.      Paragraphs 1 - 5 of the Introduction to Count 13 are incorporated herein by reference.

2.      Judge Blitch threatened to refuse to hear cases involving the City of Nashville if WB was hired as their police chief.

3.      On or about  March 2, 2004, Judge Blitch called Nashville City Councilman, RWL, urged him not to allow the hiring of WB and gave as a reason that WB went after him [Judge Blitch] and his family and "pulled his records" while investigating the Blitch Ford arson.

4.      Beginning on or about March 2 , 2004, and continuing until on or about March 5, 2004, in the Valdosta Division of the Middle District of Georgia, and elsewhere

within the jurisdiction of this Court, the defendant,

## BROOKS E. BLITCH, III,

did knowingly, with intent to retaliate, take any action harmful to any person including interference with the lawful employment and livelihood of any person for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any federal offense.

All in violation of Title 18, United States Code § 1513(e).

## COUNT FIFTEEN
### Perjury–George Bessonette
### 18 U.S.C. § 1623
**Introduction to Counts 15 and 16**:

At all times relevant to Counts 15 and 16 of the indictment:

1.    George Bessonette was an assistant public defender in the Alapaha Circuit.

2.    George Bessonette represented ES who was charged with aggravated assault for shooting another person in the head.

On or about June 12, 2007, in the Macon Division of the Middle District of Georgia, and elsewhere within the jurisdiction of this Court, having taken an oath to tell the truth under penalty of perjury, before a Grand Jury of the United States, the defendant,

## GEORGE BESSONETTE,

knowingly, and contrary to the oath, made the following false material declarations

in response to the following questions:

### First Specification of Perjury:  The Fix was in a Little Bit

**Q:**   Have you ever stated to another person that you suspected that "the fix was in
a little bit" with regard to the case of ES, a criminal case pending before Judge
Blitch in the Alapaha Circuit?

**A:**   **No** . . .
When in truth and in fact, as Defendant George Bessonette then and there well
knew and believed, he had stated to another person:

GB:  But anyway, he wound up (ui) a plea and they, they let him plea to uh, (ui)
Judge Blitch just gave him three years.  But I think that, you know, once I, I . . . well
you know, I knew that kinda the fix was in a little bit and I just basically stood there
and didn't have much to say about nothing.

All in violation of Title 18, United States Code § 1623.

### COUNT SIXTEEN
### False Statements–George Bessonette
### 18 U.S.C. § 1001(a)(2)

On or about June 9, 2007, in the Valdosta Division of the Middle District of

Georgia, and elsewhere within the jurisdiction of this Court the defendant,

### GEORGE BESSONETTE,

did knowingly and willfully make a materially false, fictitious and fraudulent

statement and representation in a matter within the jurisdiction of the executive

branch of the Government of the United States,

To wit:  the defendant falsely stated to Special Agents of the Federal Bureau

of Investigation that he had never stated to another person that "the fix was in a little

bit" with reference to a criminal case against ES then pending in the Alapaha Circuit.

In truth and in fact, as the defendant then and there well knew, and believed,

he had stated to another person that:

GB:  But anyway, he wound up (ui) a plea and they, they let him plea to uh, (ui) Judge Blitch just gave him three years. But I think that, you know, once I, I . . . well you know, I knew that kinda the fix was in a little bit and I just basically stood there and didn't have much to say about nothing.

All in violation of Title 18, United States Code § 1001(a)(2).


## COUNT SEVENTEEN
### False Statements – Brooks E. Blitch, III
### 18 U.S.C. § 1001

On or about May 5, 2005, in the Valdosta Division of the Middle District of

Georgia, and elsewhere within the jurisdiction of this Court the defendant,

## BROOKS E. BLITCH, III,

did knowingly and willfully make a materially false, fictitious and fraudulent

statement and  representation in a matter within the jurisdiction of the executive

branch of the Government of the United States as follows:

Judge Blitch falsely stated to special agents of the FBI:

That he had not told WHW, a convicted felon, that he [WHW] could possess a

firearm for purposes of hunting, and that whatever he told WHW would be contained

in the records of the clerk of court.

All in violation of Title 18, United States Code § 1001(a)(2).


## COUNT EIGHTEEN
### Aiding and Abetting Possession of a Firearm by a Convicted Felon -
### Brooks E. Blitch, III
### 18 U.S.C. §§ 922(g)(1) and 2

On or about May 3, 2005, in the Valdosta Division of the Middle District of

Georgia, and elsewhere within the jurisdiction of this Court,

## BROOKS E. BLITCH, III

did, knowingly aid and abet and counsel and induce, WHW, who had previously

been convicted of the felony offense of murder, a crime punishable by more than

one year in prison, to possess a firearm to wit: 1) a Browning rifle serial number

01290NN351; 2) a 12-gauge pump shotgun manufactured by J.C. Higgins bearing

a Sears Roebuck insignia; 3) a Remington Winchester Master 870 12 gauge

shotgun; serial number S937171V; 4) a Winchester Model 1300, 12 gauge

shotgun, serial number L3351924; 5) a Weatherby Vanguard .270 caliber rifle

serial number VS99634; 6) a Remington Model 700 serial number A6746993, all

of which had previously been shipped and transported in interstate commerce.

To wit, Judge Blitch personally told WHW that he did not object to WHW,

a convicted murderer, having guns for hunting and that the sheriff agreed with

him.

All in violation of Title 18, United States Code §§ 922(g) and 2.

### COUNT NINETEEN
### Extortion by a Public Official
### Brooks E. Blitch, III
### 18 U.S.C. §§ 1951 and 2

1. Paragraphs 1,6 and 10 of the Introduction are incorporated herein by reference.

2. Defendant GM was an attorney in private practice and had criminal cases

pending before Judge Blitch in the Alapaha Circuit.

3. The "fixing" or non-prosecution of DUI offenses has an effect on interstate

commerce.

4. On or about June 6, 2007, through on or about June 8, 2007, in the Valdosta

Division of Middle District of Georgia, and elsewhere within the jurisdiction of this

Court, the defendant,

### BROOKS E. BLITCH, III

aided and abetted by persons known and unknown to the grand jury, did

knowingly, willfully and unlawfully affect and attempt to affect interstate

commerce by extortion, in that Judge Blitch unlawfully obtained a thing of value

from GM with his consent under color of official right as follows:

77

Judge Blitch solicited and received assistance from attorney GM in investigating Berrien Sutton.  Judge Blitch offered to fix or "get rid of" certain DUI cases then pending in the Alapaha Circuit in which GM represented the defendants as a favor to GM.

All in violation of Title 18, United States Code, Sections 1951 and 2

A TRUE BILL

_____

S/Foreperson of the Grand Jury

Presented by:

Maxwell Wood
United States Attorney

Filed in open court this *17th* day of July, 2008.

Deputy Clerk of Court

78

# E X H I B I T      B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

UNITED STATES OF AMERICA  :

                        : **DOCKET NO. 5:08-CR-40**

      VS.               :

                        :

**BROOKS E. BLITCH, III**    :

——————————————————   :

Filed at __11:15 A__ M

DATE Sept 11 2009

D. Holmstrom

DEPUTY CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA

## PLEA AGREEMENT

It is agreed by the United States of America, by and through its undersigned attorney, and Brooks E. Blitch, III, hereinafter referred to as "Defendant," and defendant's undersigned attorney, as follows:

### (1)

Defendant acknowledges that defendant has reviewed and discussed the indictment against defendant in this matter with defendant's attorney and defendant's attorney has explained to defendant his understanding of the government's evidence.

### (2)

The defendant understands that defendant is not required to plead guilty, and that defendant has the right to plead not guilty and to elect instead to be tried by jury. The defendant understands that at a jury trial, defendant would enjoy a presumption of innocence, and that the government would have the burden of proving defendant's

guilt beyond a reasonable doubt.  The defendant understands that defendant would be entitled to the services of a lawyer at all stages of such a trial.  The defendant understands that defendant would be entitled to confront and to cross-examine the government's proof, and to present witnesses and evidence in defendant's own behalf.  The defendant understands that defendant would have the right to testify in defendant's own behalf, but that defendant could not be compelled to do so.  Defendant has discussed these rights with defendant's attorney.  Defendant is satisfied with the services of defendant's lawyer.  Defendant knowingly and voluntarily waives defendant's right to plead not guilty and to proceed to trial.

The United States Attorney and the Defendant understand and agree that the Court should consider its sentence in light of the advisory Federal Sentencing Guidelines, as explained in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (January 12, 2005).  Defendant knowingly and voluntarily waives any further objections that Defendant may have based on Booker, Apprendi v. New Jersey, 530 U.S. 466 (2000), and their progeny.  So the Defendant agrees that at sentencing the Court may determine any pertinent fact by a preponderance of the evidence and the Court may consider any reliable information, including hearsay.  The Defendant expressly waives any claim of right to an indictment, trial by jury, and/or proof

2

beyond a reasonable doubt on any factual determinations that pertain to sentencing in this case.

(3)

Defendant being fully cognizant of defendant's rights, and in exchange for the considerations to be made by the United States as set forth in paragraph (4) below, agrees pursuant to Rule 11(c), Federal Rules of Criminal Procedure, as follows:

(A)    The defendant is guilty and will knowingly and voluntarily enter a plea of guilty to Count Nine which charges defendant with violations of 18 U.S.C. § 1341, 1343, 1346 and 1349—Honest Services Fraud Conspiracy.

(B)    That defendant fully understands that defendant's plea of guilty as set forth in Subparagraph (A), above, would ordinarily subject defendant as to Count Nine to a maximum term of imprisonment of twenty (20) years, a $250,000 fine, three (3) years supervised release and a $100 mandatory assessment.

However, this plea agreement is made pursuant to Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, and Defendant and the United States Attorney agree that a sentence of a term of probation and a fine, the amount of each to be determined by the Court, is the appropriate sentence in this case, and the parties request that such a sentence be imposed by the Court. Defendant understands that if the Court accepts



this agreement, this request will be binding upon the Court. Defendant further understands that if the Court rejects this plea agreement the Court must do so on the record and in open Court. The Court must advise the defendant of the following: (A) inform the parties that the Court rejects the plea agreement, (B) advise the defendant personally that the Court is not required to follow the plea agreement and give the defendant the opportunity to withdraw the plea and (C) advise the defendant personally that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the defendant than the plea agreement contemplated. The Government further agrees that should this plea be withdrawn based on the Court notifying the parties that it will not accept the terms of this agreement, the Government will not make any use of the statements made by the Defendant during the plea colloquy or as stipulated in this agreement in any subsequent trial which might be necessary.

(C)   Subject to the conditions stated in Paragraph 3(B), the defendant acknowledges and understands that the Court is not bound by any estimate of the advisory sentencing range that defendant may have received from defendant's counsel, the government, or the Probation Office. The defendant further acknowledges and agrees that defendant will not be allowed to withdraw defendant's

4

plea because defendant has received an estimated guideline range from the government, defendant's counsel, or the Probation Office which is different from the advisory guideline range computed by the Probation Office in the Presentence Report and found by the Court to be the correct advisory guideline range.

(D)     Except as set forth in Paragraph 3(B), the defendant understands fully and has discussed with defendant's attorney that the Court will not be able to consider or determine an advisory guideline sentencing range until after a pre-sentence investigative report has been completed.   The defendant understands and has discussed with defendant's attorney that the defendant will have the opportunity to review the pre-sentence investigative report and challenge any facts reported therein. The defendant understands and has discussed with defendant's attorney that any objections or challenges by the defendant or defendant's attorney to the Pre-Sentence Report, the Court's evaluation and rulings on that Report, or the Court's sentence, will not be grounds for withdrawal of the plea of guilty.

(E)     Subject to the conditions states in Paragraph 3(B), Defendant understands and has discussed with defendant's attorney that after the Court considers the advisory guideline range for this case, the Court will have the discretion to impose a sentence that is more severe or less severe than the advisory guideline range.



5

(F)    Defendant agrees to pay the mandatory assessment of $100.00 at the time of sentencing.

(G)    The defendant understands that ordinarily Title 18, United States Code, Section 3742, will in certain cases allow for a direct appeal after sentencing followed by the Court of Appeals' limited review of a defendant's sentence.  Provided the Court follows the plea agreement, defendant by this agreement forever waives any right to an appeal or other collateral review of defendant's sentence in any Court. However, in the event that the District Court rejects the plea agreement and the defendant elects to plead guilty after being advised of the conditions of Rule 11(c)(5)(A)(B) & (C) and the District Court imposes a sentence that exceeds the advisory guideline range, then the defendant shall retain only the right to pursue a timely appeal directly to the Court of Appeals after the District Court imposes its sentence. In the event that the defendant retains the right to a direct appeal, that right is limited to appealing sentencing issues only.

In the event that the District court accepts the plea agreement and sentences in accord therewith, the United States waives its right to appeal. However, should the court reject the plea agreement the defendant and the United States Attorney agree that nothing in this plea agreement shall affect the government's right or obligation

6



to appeal as set forth in Title 18, United States Code, Section 3742(b).  If, however, the United States Attorney appeals the defendant's sentence pursuant to this statute, the defendant is released from defendant's waiver of defendant's right to appeal altogether.

(H)    The defendant and the government stipulate and agree that there was no detected or identified biological evidence obtained during the investigation and prosecution of the matter which is subject to DNA testing.  The defendant further agrees that all evidence obtained in this investigation and prosecution may be destroyed or returned to its rightful owner.

(4)

In exchange for the consideration set forth in Paragraph (3) above, the United States Attorney for the Middle District of Georgia agrees as follows:

(A)    That he will accept the plea of guilty by defendant as provided in Paragraph (3)(A), above, in full satisfaction of all possible federal criminal charges, known to the United States Attorney at the time of defendant's guilty plea, which might have been brought solely in this district against the defendant and that he will dismiss the remaining counts pending against the defendant under this same indictment. The United States Attorney further agrees that the sentence described in

7



paragraph 3(B) above is the appropriate disposition of this case, and hereby requests that the Court impose such sentence.

(B)    If the defendant affirmatively manifests an acceptance of responsibility as contemplated by the Sentencing Guidelines, the United States Attorney will recommend to the Court that the defendant receive a downward adjustment in the advisory guideline range.   But the decision whether the defendant will receive any sentence reduction for acceptance of responsibility rests within the Court's discretion. The United States expressly reserves its right to furnish to the Court information, if any, showing that the defendant has not accepted responsibility, including, but not limited to, denying his involvement, giving conflicting statements as to his involvement, or engaging in additional criminal conduct including personal use of a controlled substance.

(5)

This Plea Agreement does limit the discretion of the Court.

(6)

This agreement constitutes the entire agreement between the defendant and the United States, and no other promises or inducements have been made, directly or indirectly, by any agent of the United States, including any Assistant United States

8



Attorney, concerning any plea to be entered in this case. In addition, defendant states that no person has, directly or indirectly, threatened or coerced defendant to do or refrain from doing anything in connection with any aspect of this case, including entering a plea of guilty.

(7)

As an aid to this Court, the United States Attorney and the defendant, by and through defendant's counsel, enter into the following Stipulation of Fact. This stipulation is entered into in good faith with all parties understanding that the stipulation is not binding on the Court. Under U.S.S.G. Policy Statement Section 6B1.4(d), this Court may accept this stipulation as written or in its discretion with the aid of the Pre-Sentence Report determine the facts relevant to sentencing.

Subject to the above paragraph, the United States Attorney and the defendant stipulate and agree that the following facts are true and would be proven beyond a reasonable doubt at a trial:

The defendant was elected Superior Court Judge for the Alapaha Circuit in 1980 and at all times relevant to Count Nine, served as the Chief Judge for that circuit. As Superior Court Judge, the defendant's responsibilities included:

a.      Supervising grand juries, presiding over criminal trials, pleas of guilty, sentencing, bond and probation revocation and related matters;

b.      Presiding over civil lawsuits and related matters;

c.      Appointing judges and magistrates to juvenile and magistrate Courts; and,

d.      Collecting and remitting to the various county commissions monies collected through fines, restitution, fees and surcharges in criminal and civil cases. O.C.G.A. § 15-6-8.

The defendant admits that he was bound by the Georgia Code of Judicial Conduct in particular the following Canons 1, 2A, 2B, 3B(7), 3B(11), 3C(4), 3E(1)(c), 3E(2), and 5C(4).

In furtherance of the conspiracy charged in Count Nine of the Indictment, the Defendant admits that he did engage in a scheme and artifice to defraud the State of Georgia of the intangible right to his honest services, in that Defendant did:

a.      Engage in *ex parte* communications regarding pending cases with attorneys, litigants, friends and family members of litigants and other persons, in violation of the Georgia Code of Judicial Conduct.

10

b.     Enter judicial orders and take other official action based on his authority as a Superior Court Judge in violation of Georgia laws, his oath of office and the ethical rules and regulations governing the Courts of the State of Georgia, including but not limited to:  i) reducing sentences he had previously imposed as well as sentences imposed by other judges without holding a hearing or providing notice as required by law; ii) reducing bonds or otherwise authorizing the release of persons incarcerated without holding a hearing; iii) engaging in plea negotiations or stating in *ex parte* communications what ultimate outcome he intended to cause in a case.

The defendant admits that the following specific acts, among others, were committed as a part of the defendant's course of conduct.

On or about January 19, 2006, coconspirator Hayward Collier contacted Defendant on behalf of DJM, an individual who was then incarcerated in the Berrien County Jail on drug related charges. Collier asked Defendant to release DJM from jail. DJM was released on bond after this contact. The District Attorney was not made aware of the ex parte communications between Defendant and Collier.

On or about February 10, 2006, co-conspirator Heyward Collier contacted Defendant on behalf of MAH, who was charged with violation of probation. Defendant had a discussion with a  probation officer and dismissed the warrant

11



pending against MAH without any hearing and without notice to the District Attorney.

On or about April 24, 2007, CB telephoned Defendant on behalf of MB, who was incarcerated for Aggravated Assault. CB requested that MB be released on bond. Defendant later released MB after calling his probation officer. The release of MB occurred without a hearing and without notice to the District Attorney. The telephone calls made by Defendant were transmitted in interstate commerce as a part of the scheme and artifice to defraud.

Defendant admits that the foregoing conduct had the effect of depriving the State of Georgia of the intangible right to the honest services of Defendant. As part of the foregoing conduct, Defendant did make and receive telephone calls, which were transmitted in interstate commerce. Defendant admits and acknowledges that the evidence is sufficient to prove the Defendant's guilt as to Count Nine beyond a reasonable doubt.

(8)

## ACCEPTANCE OF PLEA AGREEMENT

Defendant understands and has fully discussed with defendant's attorney that

this agreement shall become effective only upon the Court's acceptance of this

agreement and the Court's acceptance of the plea of guilty by the defendant.

SO AGREED, this __11__ day of __Sept.__ 2009.

G.F. PETERMAN, III
Acting United States Attorney

BY: _____

JIM CRANE
Assistant United States Attorney
Georgia Bar No. 193275

_____

LEAH McEWEN
Assistant United States Attorney
Georgia Bar No. 490763

_____

GRAHAM A. THORPE
Assistant United States Attorney
Georgia Bar No. 710650

13

I, Brooks E. Blitch, III, have read this agreement and had this agreement read to me by my attorney Robert Willis. I have discussed this agreement with my attorney and I fully understand it and agree to its terms.

_____
Brooks E. Blitch, III

I, Robert Willis, attorney for defendant, Brooks E. Blitch, III,  have explained the indictment and the government's evidence received through discovery and my investigation of the charge to defendant. I believe defendant understands the charge against defendant and the evidence that would be presented against defendant at a trial. I have read this agreement, have been given a copy of it for my file, and have explained it to defendant.  To the best of my knowledge and belief, defendant understands this agreement.

_____
Robert Willis
Attorney for Defendant

14

# EXHIBIT  C

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF GEORGIA, MACON DIVISION

UNITED STATES OF AMERICA

**V.**

BROOKS E. BLITCH, III

**JUDGMENT IN A CRIMINAL CASE**

Case Number 5:08-CR-00040-001-HL

USM Number: 93445-020

Robert Stuart Willis
Defendant's Attorney

## THE DEFENDANT:

☒ pleaded guilty to count(s) 9.

☐ pleaded nolo contendere to count(s) which was accepted by the court.

☐ was found guilty on count(s) after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. §§1341, 1343, 1346, 1349 & 2 | Honest Services Fraud Conspiracy | 06/15/2007 | 9 |

The defendant is sentenced as provided in the following pages of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) .

☒ Count(s) 1, 2, 3-8, 10,11,13,14,17,18,19 are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material changes in economic circumstances.

December 1, 2009
Date of Imposition of Judgment

Signature of Judge
HUGH LAWSON, Senior United States District Judge

12/7/09
Date

DEFENDANT: BROOKS E. BLITCH, III                                        Judgment - Page 2
CASE NUMBER 5:08-CR-00040-001 (HL)
DISTRICT: MIDDLE DISTRICT OF GEORGIA

## PROBATION

The defendant is hereby placed on probation for a term of 3 years.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from placement on probation and at least two periodic drug tests thereafter.

☒    The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

☒    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

☒    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) As directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which he or she resides, works or is a student, or was convicted of a qualifying offense. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)
     If this judgment imposes a fine or restitution, it is a condition of probation that defendant pay in accordance with the Schedule of Payments sheet of this judgment

The defendant must comply with the standard conditions that have been adopted by this court as well as any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)    the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)    the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)    the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)    the defendant shall support his or her dependents and meet other family responsibilities;

5)    the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)    the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)    the defendant shall refrain from the excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)    the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)    the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)   the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11)   the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)   the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)   as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

DEFENDANT: BROOKS E. BLITCH, III
CASE NUMBER 5:08-CR-00040-001 (HL)
DISTRICT: MIDDLE DISTRICT OF GEORGIA

Judgment - Page 3

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in the Schedule of Payments.

|  | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 100,000 | $ |

☐ The determination of restitution is deferred until            . An *Amended Judgment in a Criminal Case* will be entered after such a determination.

☐ The defendant must make restitution (including community restitution) to the following victims in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C § 3664(I), all nonfederal victims must be paid in full prior to the United States receiving payment.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on any fine or restitution of more than $2,500.00, unless the fine or restitution is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payments sheet may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The Court has determined that the defendant does not have the ability to pay interest, and it is ordered that:

  ☐ the interest requirement is waived for the   ☐   fine   ☐   restitution.

  ☐ the interest requirement is waived for the   ☐   fine   ☐   restitution is modified as follows:

*Findings for the total amount of losses are required under Chapter 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: BROOKS E. BLITCH, III
CASE NUMBER 5:08-CR-00040-001 (HL)
DISTRICT: MIDDLE DISTRICT OF GEORGIA

Judgment – Page 4

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☐ Lump sum payment of $    Due immediately, balance due

       ☐ not later than    , or

       ☐ in accordance with    ☐ C, ☐ D, ☐ E; or ☐ F below; or

**B** ☒ Payment to begin immediately (may be combined with    ☐ C, ☐ D, or ☐ F below; or

**C** ☐ Payment in equal installments of $ over a period of , to commence 60 days after the date of this judgment; or

**D** ☐ Payment in equal _____ installments of $ over a period of , to commence 60 days after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within 30 days after release from imprisonment. The Court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several
     Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.